**UNITED STATES of America,**
**Plaintiff,**

v.

**FORD MOTOR COMPANY and the Electric Autolite Company, Defendants.**

**Civ. A. No. 21911.**

United States District Court
E. D. Michigan, S. D.
June 7, 1968.

William H. McManus, Lawrence F. Noble, Lawrence M. Jolliffe, Attys., Dept. of Justice, Washington, D. C., for the United States.

Wright Tisdale, Richard B. Darragh, Dearborn, Mich., Jerome G. Shapiro, L. Homer Surbeck, David B. Hudnut, William T. Holcomb, Jr., Everett J. Haller, David A. Diamond, Hughes, Hubbard, Blair & Reed, New York City, George E. Brand, Jr., Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., for Ford Motor Company.

A. Stewart Kerr, P. Joseph Pascoff, Sweeny, Dodd, Kerr, Wattles & Russell, Detroit, Mich., for the Electric Autolite Company ELTRA Corporation).

## OPINION

FREEMAN, Chief Judge.

This is a Government divestiture action under Clayton Act, § 7, as amended, 15 U.S.C. § 18, challenging the 1961 purchase, for 28 million dollars, of select assets of Electric Autolite Company by Ford Motor Company, the nation's second-largest producer of mechanized vehicles, with annual sales then exceeding two million units and resources approaching four billion dollars.[1]

The automotive machine is a complex assembly of hundreds of parts. This litigation revolves around a comparative handful: the battery, spark plugs, and a group of possibly less-familiar items, together with their components, in the electrical system—the starter, voltage regulator, ignition coil, generator (or alternator) and distributor. Like all of its competitors, principally General Motors, Chrysler and the much smaller American Motors, Ford has never manufactured everything which has gone into

---

1. Clayton Act, § 7, as amended, 15 U.S.C. § 18 provides in pertinent part:
 "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

its cars, trucks and farm tractors.[2] In the mid-1950's, most of these enumerated elements were among those which it purchased from outsiders. While buying rather than making can be economical in some instances in any industry, Ford management, faced with excess plant capacity and ample capital reserves, was beginning to have serious doubts about the breadth of its extra-organizational procurement policy. Contributing to the misgivings was an obvious shift in the service habits of the car-owning public. The more than 9,000 Ford franchise vehicle dealers throughout the country, among whom there existed a strong propensity to obtain materials for repairs through the defendant's [3] wholesaling divisions feeding the aftermarket (replacement-parts trade), were losing maintenance business to gasoline filing stations and engine specialty shops which found it more convenient to get supplies from nearby non-Ford affiliated distributors.[4] Although this trend was irreversible, Ford felt that it could make the most of a bad situation if it could obtain a manufacturer's profit on as much of the merchandise as possible moving through these so-called independent middlemen.[5] Thus, one goal was for it to build more components for its own automobile population. Furthermore, for reasons detailed hereafter, in order to secure stocking rights for some Ford-application parts at the retail level, it seemed wise to also offer a variety of electrical articles for at least Chrysler and General Motors models.

The Electric Autolite Company was founded in 1922 to assume the Electric Auto-Lite Division of Willys Corporation; it has been a leader in automotive lighting and ignition apparatus ever since. In 1934, it merged with Moto Meter Gage and Equipment Corporation, the President of which, Royce Martin, chiefly on the basis of personal contacts, succeeded in drawing to the firm the bulk of Chrysler's electrical needs. Autolite's history is a story of expansion, contraction and diversification according to the latter's demands. For example, spark-plug fabrication was commenced at its specific request. During most of the two decades after the Moto Meter acquisition, Chrysler was the primary outlet for Autolite plugs and batteries, together with, among additional components instruments, die castings, cable and fractional-horsepower motors. While American Motors and, in the truck and tractor field, International Harvester Corporation and others did deal with Autolite, Chrysler was truly its *raison d'etre*.[6]

2. Except where otherwise noted, this decision deals only with United States producers, plants, markets and operations. All industry and similar percentages are taken in reference to a base of 100, exclusive of the influence of imports.

3. Electric Autolite Company, now known as ELTRA Corporation, was joined as a defendant on the theory that if a violation of Section 7 is proven, the Government may be entitled to force it to take back the assets it sold to Ford. ELTRA's motion for release from the litigation, made at the outset of the trial, has been taken under advisement. For purposes of this opinion, the word "defendant" refers to Ford only.

4. A survey conducted for Ford in 1960 indicated that the volume of all servicing done by franchise automobile dealers dropped to 16% from 28% in 1952 while the share attributable to filling stations increased from 34% to 47%.

The licensees' portion of minor mechanical repair work, the type most likely to call for replacement of many of the components discussed in the text, dropped during the eight-year period from 39% to 24%. Almost all of this difference was absorbed by retail gasoline outlets.

5. Although the term "independent" is used to designate replacement-market wholesalers and retailers other than Ford franchise dealers, it should not be taken to signify that the latter are under an obligation of any kind to purchase any replacement parts from defendant if the items are available elsewhere.

6. American Motors Corporation is the result of the 1954 merger between two automobile manufacturers, Nash-Kelvinator Corporation and Hudson Motor Company. Textual references to AMC relate, where appropriate, to one or both of its predecessors.

The scene changed drastically upon Mr. Martin's death in 1955. The subsequent year Chrysler ordered a significant share of its batteries from Autolite's rivals, which by 1960 were furnishing more than two thirds of its requirements. In 1957, the word went out that Chrysler intended to integrate construction of distributors, generators, starters and voltage regulators—all of which previously had been gotten from Autolite.[7] This upheaval, along with several other disturbing considerations, led Autolite to foresee the possibility that it might shortly be left with a fixed-volume spark-plug plant but without a customer big enough to warrant the output; for, of the two major users besides Chrysler, General Motors made its own and Ford had been buying exclusively from another source for half a century. The brand name "Autolite," which had been raised to prominence by a multi-million-dollar investment in advertising, was also a subject of much anxiety. Due to the peculiarities of the industry, it could become nearly worthless for spark plugs if the company lost the Chrysler entree. Moreover, that portion of the aftermarket accustomed to the label on most of the items definitely being phased out at Chrysler carried them because of their original-equipment status which was then fast disappearing.

Around the beginning of 1960, Autolite sent a task force of salesmen to Ford in a concerted effort to convince defendant to take on at least some "Autolite" plugs. Ford had a better idea; it would relieve Autolite of the potential albatross of a factory. After arduous negotiations, the agreement precipitating this lawsuit was signed, pursuant to which Ford received the plug facility at Fostoria, Ohio, together with the "Autolite" trade name, one of six operating battery installations, at Owosso, Michigan, the services of a few personnel, and limited distribution rights.[8] Within a few months, Electric Autolite was again turning out spark plugs on a small scale, having continued uninterrupted manufacture of batteries and a host of other electrical elements.[9] At the same time it started publicizing, although not with the vigor which had attended the promotion of "Autolite," another mark, "Prestolite," previously seen only on batteries in isolated regions but now destined to appear on its full automotive line across the nation. However, the emphasis shifted to the private-label accounts, including, in a few instances, Chrysler, Ford and General Motors, which prefer the goods under their own insignia. Finally, it widened its base by venturing into new areas and, upon its merger in 1963 into Mergenthaler Linotype Company to form a combination with a 200 million dollar asset value, became known as ELTRA Corporation.[10]

Ford ended up in the position to satisfy its entire call for spark plugs internally. On the other hand, to this day it still purchases several million batteries annually; for Owosso cannot furnish enough for both new-vehicle and replacement purposes. Furthermore, defendant has gone forward under "Autolite" with a plan first implemented in 1960 for an independent-aftermarket assortment of other parts. An Autolite

7. By 1960, Electric Autolite's sales of automotive parts to Chrysler had declined from a 1957 level of $142.6 million to $57.7 million.

8. Electric Autolite had been anxious to rid itself of several plants making other types of electrical parts; however, Ford declined to purchase them both because they were older than the factories it acquired and because for some time they had been centers of labor unrest.

9. It did cease manufacture of certain items, e. g., bumpers, always of marginal profitability at best and totally uneconomical when Chrysler, for which they had been produced largely as a goodwill gesture, stopped buying many more lucrative components.

10. Actually, diversification became significant the year prior to the acquisition in suit when Electric Autolite took control of Hiller Aircraft Corporation, Marshalltown Manufacturing, Inc., and the Equitable Leasing Corporation. At the time of the Ford transaction, Autolite's assets totaled approximately 150 million dollars.

Division was formed to advance the cause among non-franchisee retailers and the acquired name appears frequently on Ford engines.

## I

## MARKETS

Almost six months to the day after the transfer had been completed, the United States filed the present complaint asserting that the effect is a probable substantial lessening of competition in four lines of commerce throughout the entire country. While Ford vehemently denies the likelihood of injury, it agrees that the Government has correctly described the relevant geographical territory and concedes the appropriateness of three product markets: automobiles, automotive batteries and spark plugs. With respect to the fourth, which plaintiff denominates "ignition parts," there is a dispute. In the Government's lexicon, the expression encompasses starters, generators and alternators, ignition coils, voltage regulators, distributors, and, more important, many of their members.[11] Ford holds that no "meaningful definition of * * * 'ignition parts' can be framed so as to constitute a line of commerce." This criticism is leveled for two reasons: insufficient economic identity in the industry and lack of interchangeability among the alleged constituents, that fundamental quality of any properly delineated market. United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The evidence does demonstrate that there is little chance of substitution within this category. Each element fulfills a unique function. Generators and alternators, which convert mechanical into electrical energy, can hardly be replaced by distributors, which assign a given amount of current to a particular spark plug. Coils and regulators cannot stand in for one another nor for starters, distributors or generators. In the aftermarket, the concern here, where sales are on a finished-goods instead of production-contract basis, exchangeability within a generic type is also severely restricted. Sometimes it is a matter of performance. A six-point distributor cannot be used in an eight-cylinder motor. In other instances it is a question of size and mounting. A generator simply may not fit on a Chevrolet if it was designed for a Plymouth. Variations occur not only from vehicle manufacturer to manufacturer and year to year, but also among different contemporary vehicle styles of the same make and even between two identical models built several months apart. All in all, the variations are awesome. A fully stocked garageman bent on following Detroit's instructions to the letter would have had to have on hand in order to service Chrysler Imperials of 1957 through 1960 vintage, ten numbers of generators, seven of distributors, and four each of starting motors and regulators. The amount he would have charged for a distributor would have run from $27.45 to $34.45, with the one picked depending upon year, style, and, if he was working on a 1959 car, whether it had been rolled out early or late in that period. The obstacle in matching portions of basic units is the same. The distributor cap for most 1956 Buicks was fastened with screws inserted vertically. The succeeding year's version, half again as tall, was affixed with a horizontal clamping device. A price list of the more commonplace Gen-

---

11. An alternator is a relatively recent device which in some cars takes the place of a generator and serves the same purpose of converting mechanical into electrical energy for supply to the ignition system and for charging the battery. The regulator controls the maximum output of the generator, limits the voltage furnished to the battery and serves as a circuit breaker to prevent the battery from discharging back through the generator. The coil steps up the ignition-system voltage, which is then fed by the distributor to each spark plug at the proper time and in the correct sequence. The central item in the starter is the starting motor. It draws upon power stored in the battery to, in effect, crank the engine, which in turn is the source of mechanical energy for the generator.

eral Motors electrical items for 1955–64 passenger automobiles and light trucks, virtually all of GM or American Motors origin, contains approximately 800 entries. It is also true that "ignition parts" is ambiguous. To a Ford representative the term includes spark plugs and high-tension wiring. A Government witness was not even sure that, as the United States urges, it embraces generators. Of three ignition-parts brochures in evidence, two mention plugs while the third does not. However, it displays numerous switches, e. g., horn relays, not seen in the others. Of course, these discrepancies could be more accidental than substantive; groceries can comprise a market even if a few food stores in a community handle gastronomic exotica while many carry culinary utensils or children's encyclopedias. See United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966).

Indeed, the advertising materials submitted by Ford do much to discredit its stand on both counts. They affirm what the testimonial record already shows—that there are competitive *lines* of articles for ailing engine electrical systems, which, according to their most significant function, might be called the ignition systems. Realistically, the firms behind them are best thought of as cataloguers and branders—merchandisers—rather than fabricators.[12] While many do some manufacturing, few, if any, make all they sell and most build very little. To round out their selections they deal with each other. Thus, they regularly buy from and produce for rivals with which they are locked in combat for space on the repairman's shelf. Generally, this battle is actually waged by the salesmen of non-exclusive, independent-contractor warehousers and jobbers. A decade ago merchandisers were classified according to the adaptability of their wares. The greater slice of the business had been captured by sponsors of items for only certain vehicles, the ones on which the same components under their names were original equipment. Electric Autolite, a supplier to Chrysler and American Motors, was typical of the "genuine parts" proponents.[13] The rest belonged to outfits, referred to by the Establishment as "gyps" because they lacked original-equipment status, furnishing specially conceived assortments of commendable workmanship, which, through slight deviations from original specifications for the sake of increased fungibility, covered all popular machines (and, incidentally, those of any single company) with a minimum of numbers per generic type.[14] With the movement toward neighborhood gasoline stations for simpler tune-ups, by the late 1950's everyone began to strive toward the same objective: the compilation of a quality assemblage of faster-moving items, easily inventoried and used by the frequently more inexperienced serviceman engaged in predominantly light work, and suitable for the majority of the conveyances on the highway. Nevertheless, the restricted versus wide-application dichotomy endures. Traditionally, wholesalers carried

12. More precisely, unless otherwise noted, the term "merchandiser" (and equivalents "sponsor" and "marketer") is used in Parts I and II to denote a company which publishes a catalogue under its own name to achieve with respect to at least the bulk of the electrical engine components listed therein the economic significance of a brand proprietor in many contexts. Most of the items in its brochure will carry the name appearing on the cover, although there are instances, generally involving small parts, where this may not be the case.

13. By 1958 there were only three major genuine-parts sponsors: Electric Auto-lite, General Motors and Holley Carburetor Company, the *primary electrical* supplier to Ford. At that time Autolite and Holley apparently manufactured everything which was sold in the aftermarket under their names.

14. For example, one recent all-make catalogue contains only three ignition-coil numbers for all popular vehicles. To achieve the same coverage with original-equipment-type coils, an outlet would have to stock approximately a dozen numbers.

narrow or all-make aggregations, but not both. Those of the former inclination composed the Automotive Electric Association, dedicated to the genuine-parts concept. An AEA adherent normally would take on nothing electrical for engines, except spark plugs and batteries, unless it had a factory-installed twin. Although this practice is breaking down, the largest segment of the AEA continues to be ruled by the authenticity notion, which also retains its attraction among most outlets. Middlemen handling the broader clusters stress convenience over ideology and score with retailers who prefer simplicity in ordering and storing. While every important merchandiser currently has an all-make line, some, chiefly Chrysler, Ford and General Motors, each now in the independent aftermarket and using its own brand on practically all original-equipment electrical engine parts even when it does not build them, are able to take advantage of the diminishing but still predominating requests for exact replicas, and, thus, have a genuine line as well.[15]

Were all the tiers of the industry composed entirely of people who felt as strongly about pedigree as the AEA once did Ford's position would approach tenability. A line of commerce is at least a recognition of competitive friction which subsides as the clamor for true copies grows. See Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). There would be none in regard to rarely damaged pieces of the chassis, which, when restoration is necessary, must be secured through the one foundry having the requisite dies. Similarly, it seems that complete distributors are available solely under the original label. The demand is apparently so slim that not only has no other producer found justification for tooling-up, but, more significantly, no other merchandiser has been prompted to purchase and resell them. By unqualifiedly insisting that distributors are within the relevant market, the United States fuels defendant's argument. The response to the complaint about substitutability lies outside the authentic-parts area but in the acknowledgment of the contention among all-make groups and between them and genuine components. While authentic parts are not interchangeable with each other either individually or by brand array, they are with their extended-scope counterparts; furthermore, all full-range collections are mutual alternatives. A mechanic can opt for what original-equipment-type replacements he wants and/or choose a portion or, more readily because they are condensed, all of one of the universal packages.[16]

In terms of the farthest reaches of cross-elasticity, a series of markets is under consideration, each with all all-make lines and one genuine line designated by the vehicles for which it was

15. Apparently the only merchandisers today without all-make lines sell parts for foreign vehicles and for some marine, farm-implement, truck and heavy-equipment engines.

16. In theory, the mechanic has additional options. For example, he could select distributor caps from one all-make line and distributor points from another. This type of buying pattern appears uncommon in practice. The record indicates that a retailer will, in all probability, deal regularly with only one wide-application array. The exceptions would come where his line does not include a particular item for which he has a call and his jobber furnishes it from another all-make array.

The extent of combining types of lines —by purchasing authentic replacements for General Motors automobiles, for instance, together with a portion of another merchandiser's wide-application assortment for use on other vehicles— is not clear. Of course, unless a serviceman limits himself to only light tune-up work, generally considered to involve little more than a change of spark plugs and adjustments (with repairs, if necessary) to the rotating parts of the distributor, he will probably have at least occasional need for components only available under the genuine label.

engineered.[17] However, nothing is gained by fragmenting the discussion in this fashion nor by proposing a procedure for calculating percentage shares.[18] In each market the multi-purpose lines are surrounded by distinguishing features. They bear a taint of illegitimacy and have particular appeal to a less skilled clientele which accepts only relatively uncomplicated maintenance assignments. They present the special problem of achieving compactness without sacrificing completeness, and, of course, travel somewhat different paths to the consumer level. Thus, it is expedient that they be placed in submarkets for weighing the probable results of the acquisition. See Brown Shoe Co. v. United States, supra. Since any undesirable consequences will show up most clearly here, the submarkets must be the foci of attention, ibid.; but, because the outcome will be the same whether they are viewed separately or together, they will be treated as one.

The varieties tendered under the names active in the markets and submarkets are not identical but they are certainly comparable.[19] Indeed, the fact that they

17. There is another line of commerce for electrical engine parts in which the buyers are vehicle and other internal-combustion-engine manufacturers insofar as they are not integrated, e. g., truck, tractor and heavy-equipment builders and light-aircraft producers. Although the Government insisted early in the trial that competition for sales to these firms was affected by the acquisition, it never took the trouble to point out how. Also included as customers in this more expansive market would be all replacement-component merchandisers insofar as they do not fabricate for themselves, to which the items they buy are akin to raw materials. Here again, plaintiff has failed to suggest wherein injury lies. See note 23 infra.

It should be understood that in the case of Chrysler, Ford and General Motors, genuine and all-make parts are typically of identical design insofar as they fit their own machines. These components take on their wide-application characteristics either because they are specially catalogued with fast-moving parts for other vehicles or because they make their way into the hands of members of the distribution chain who treat them in conjunction with elements under the same brand of a non-original-equipment nature.

18. Although the markets, in order to be laid out in manageable terms, must be described by assortments, merely computing percentages of total component sales in any of them would not give a realistic appraisal of an individual competitor's share for two reasons. First, some genuine parts, of which the distributor described in the text is an example, are non-competitive, and including sales volumes on these items would distort the performances of their sponsor. For many internal purposes, Ford judges its position in the field on the basis of its performance in contact sets. Second, while an authentic aggregation is in a very real sense vying with entire all-make lines in each market, many of the constituents of the latter, designed for vehicles of different manufacture than those for which their original-equipment-type counterparts are engineered, are not effective substitutes for elements in the former, but are nevertheless obtained together with parts which are interchangeable when a purchase is on something approaching a full-line basis.

Because much of the strength of wide-application assortments lies in the convenience of the all-make concept, there may be considerable interaction among the markets. Should a customer become dissatisfied with General Motors authentic components, for instance, he is liable to discontinue carrying Chrysler and Ford original-equipment replacements also and opt for an entire wide-application array.

19. The following table, based upon five all-make catalogues in evidence, shows which of the listed electrical components, although, obviously, in a few cases not parts of the engine electrical system, are merchandised through them. By way of comparison, if its sponsor has original-equipment status on the elements, an authentic-parts brochure is likely to include, besides the articles appearing below, complete distributors, new generators and starting motors, generator armatures and various additional bearings, leads, springs and pulleys. Of course, the genuine catalogue would also probably list more numbers per generic type. See note 14 supra and accompanying text.

| Catalogues | Distrib-utor Caps | Distrib-utor Rotors | Distrib-utor Points | Distrib-utor Condensers | Distrib-utor Bushings |
|---|---|---|---|---|---|
| United Delco | X | X | X | X | |
| Niehoff | X | X | X | X | X |
| Wagner | X | X | X | X | X |
| Atlas (a) | X | X | X | X | |
| Unico (b) | X | X | X | X | |

| Catalogues | Distrib-utor Leads | Distrib-utor Plates | Vacuum Chambers | Ignition Cables |
|---|---|---|---|---|
| United Delco | X (c) | | X | X |
| Niehoff | X | X | X | |
| Wagner | X | | X | |
| Atlas | | | | X |
| Unico | | | | X |

| | Starting Motors | Starter Brushes | Starter Switches | Starter Bushings |
|---|---|---|---|---|
| United Delco | X (c)(d) | X | X | |
| Niehoff | | X | X | X |
| Wagner | | X | X | X |
| Atlas | | | | |
| Unico | | | | |

| | Ignition Coils | Voltage Regula-tors | Stop Light Switches | Ignition Switches |
|---|---|---|---|---|
| United Delco | X | X | X | X (c) |
| Niehoff | X | X | X | X |
| Wagner | X | X | | |
| Atlas | X | X | X | |
| Unico | X | X | | |

| | Horn Relays | Dimmer Switches | Spark Plugs |
|---|---|---|---|
| United Delco | X | X | X |
| Niehoff | X | X | |
| Wagner | X | X | |
| Atlas | | | X |
| Unico | | | X |

(a) - Atlas products are carried by filling stations of the Standard Oil companies only.
(b) - Unico is a parts line specifically designed to service farm co-operatives. As in the case of Wagner, the bulk of this assortment is manufactured by ELTRA.
(c) - Primarily for cars for which the sponsor of this line, General Motors, is an original equipment supplier.
(d) - Rebuilt.

differ is in itself pro-competitive. The all-makes succeed precisely because they have been trimmed. Moreover, components can be procured by number rather than by lot. A distributor may be bought through the only catalogue in which it is pictured, while coils and regulators come from another with possibly lower prices. Among the full-utility assortments where the likelihood is greater that stocking would be on an entire-line instead of an individual basis, the disparities in offerings doubtless stem from conflicting opinions about whether a given element will experience sufficiently high volume to warrant its imposition on potential customers. To find no struggle at all when some of the combatants retrench with an eye toward becoming more efficient would hardly be in keeping with the intent of Section 7. A distillation of the evidence shows that nearly every firm purporting to be in the ignition field advertises generator brushes, coils, regulators and distributor rotors, points (contact sets), caps and condensers. These are the heart of the enterprise. That uniformity is not as noticeable among the remainders of the lines is immaterial, for there is no indication that the impact of the acquisition will be milder or heavier whether the supplemental ingredients are dimmer switches and generator bushings or cable and starter motors. If anything, the inference is to the contrary. The core articles are the ones for which a garageman has the greatest need. His sourcing of the others is apt to hinge upon his satisfaction with these.

## II

### IGNITION PARTS

The introductory survey noted two attributes of Ford's component operations—excessive reliance upon suppliers and aftermarket participation confined to vehicle dealers—and intimated that they were leaving an adverse impression on the earnings statement. Defendant was losing a manufacturer's profit on franchisees' sales, as well as additional income on those of non-affiliated retailers responsible for an increasing proportion of the nation's automotive servicing who were not persuaded to favor Ford's wholesaling over that of an independent and often more accessible middleman.[20] The proposals adopted for integrating production of ignition parts—a term hereafter meaning electrical engine components, except spark plugs and batteries, and, in particular, the core articles listed above—are irrelevant; growth in this regard, not yet culminated, was by internal expansion. On the other hand, the defendant's distribution endeavors on behalf of these elements are crucial.

They commenced in the Spring of 1959 when the Executive Committee approved the development of a merchandising program to be conducted through independent warehousers and jobbers on an initial Ford-population-application but eventual all-make basis and under the "Motorcraft" brand. The selection was small at first; more items were to be included from time to time. However, they were always to be only of a "competitive" type, i. e., also obtainable from the "gyps" or from United Motor Service, the new wide-adaptability marketing branch of General Motors, the first assembly-line supplier to enter the multipurpose field. This qualification together with "Motorcraft," a label different from any of those, principally "FoMoCo," which Ford would use on original equipment and put on Ford-

---

20. This statement was not universally true. The franchise dealers have always acted as middlemen between Ford's wholesaling divisions and a small number of filling-station mechanics and others who would buy parts from licensees at an off-list price. In the event of such purchases, the franchisees received a redistribution rebate from the company. However, with rare exception they had no salesmen actively soliciting the business of repair outlets in their communities as did independent jobbers, which were usually large garages in an area averaging possibly only a few square miles, often able to provide round-the-clock emergency-delivery service. In addition, certain rare components were available only through someone connected with the Ford organization.

vehicle replacements contained in the new line but shipped to its franchisees, came in answer to the biggest drawback it encountered in the new undertaking. Caution was necessary to minimize the diversion of business away from these old outlets, which with dual-branding, now abandoned, would have the really genuine parts. The trade through them is more lucrative for Ford, because they buy directly from defendant without the expensive intercession of other promoters. Ford also wanted to protect the licensees' repair revenues, which, when car turnover is slow, can pay their overheads.

While Motorcraft got off the ground, the performance was less than prodigious. Because it had not yet achieved all-make breadth, defendant centered its efforts within the Automotive Electric Association and by 1961 had contracted with half of the approximately 100 AEA warehousers.[21] Yet, the first year's forecasted million-dollar net gain ended up a deficit. Unlike General Motors, Ford had been unable to reach agreements with any major oil or rubber companies whereby they would push Motorcraft among their gasoline and tire customers. By 1961, Management thinking was that survival turned upon a "good" name (which should also be employed on new automobiles), coverage for non-Ford cars and trucks, and more inside construction. The evidence highlights few of the facts from which this conclusion may have been derived. Neither the view about the weight of each of these factors nor the difficulty foreseen in improving "Motorcraft's"

stature is disclosed. The acquisition came too quickly to permit a scientific evaluation of the success defendant would have had in following the guidelines without Autolite's help. Indeed, how well Ford is doing *with* it is purely a question of speculation.[22]

Those attorneys who have castigated the "introduce the statistics and rest" methodology which has permeated the Government's attitude in so many Section 7 cases may be startled to learn that with respect to ignition parts its presentation reveals not one meaningful figure. The record does show that "there's about 12 or 16" little corporations similar to the F & B Manufacturing Company, the Vice President of which, Vladimir Filko, was plaintiff's only industry witness. He did not relate the number of more sizeable concerns he runs across. Darkness also shrouds another consideration which heretofore has been thought germane to merger litigation—the standings, absolute and relative, of the contenders. Although the Court will thus not dwell upon such hackneyed terms as "share" and "concentration," the novelty will not provoke unbounded enthusiasm among the Bar. Plaintiff's scenario announces this as the bigness-is-badness act of the drama and at the outset warns:

"It would be a serious oversight to attempt to analyze the probable effects of this acquisition [without appreciating that] there are smaller competitors who are dependent solely on the sale [of ignition parts] for their success or failure." [23]

---

21. When defendant initiated its Motorcraft program, AEA members for the first time were asked to carry genuine parts but under a name different from that which appeared on original equipment. Dissatisfaction with this arrangement was probably partially responsible for the fact that only about 50% of the AEA warehousers participated in the Motorcraft project. Since Ford made few ignition parts, they could do about as well handling replacements under defendant's suppliers' brands.

22. For what it is worth, defendant's evidence shows that whereas prior to the Autolite acquisition Ford management anticipated that pre-tax profits for the first five years on all assets purchased would aggregate $27.7 million, they actually totaled only $5.7 million. There is no breakdown of the figures by spark plugs, batteries and other parts.

23. It is this summarized position which leads the Court to conclude that plaintiff does not really believe that the acquisition injured competition in the

One misconception easily drawn from this excerpt from the United States' brief and from Mr. Filko's preoccupation with the diminutive requires an immediate word of clarification. While undoubtedly some of the companies are not giants, Ford is by no stretch of the imagination a lonely bull in a china shop. Such stalwarts besides itself as Chrysler, ELTRA, General Motors, Gulf and Western Industries and the Standard Oil companies, working together through a joint subsidiary, are found in the all-make submarkets.

Boiled down to its essence, the Government's case is that the Clayton Act has been violated because, by virtue of the combination in issue, Ford augmented the Motorcraft electrical line, is capable of providing spark plugs and batteries in conjunction with it, and has the benefit of a pre-existing distribution network and of "Autolite." However, there is not a scintilla of proof that the defendant's present ignition array, suiting all popular machines, is causally connected with

the transaction. The independent-aftermarket venture was born with a multipurpose outlook in the hope of capitalizing upon the shift of maintenance work to neighborhood shops. A full year before earnest negotiations with Electric Autolite began, the goal, to all appearances on the information then known fully attainable, had been a gradual buildup in breadth and manufacture. At no place in the hundreds of pages of documents retrieved by the United States from Ford's files was it suggested to be beyond reach unless the defendant bought a trade name or went into plugs and batteries. None of the inter-office memoranda written after April 1961 noting an addition to the catalogue hints that incorporation was prompted by the events of that month; nor does it foster the inference that sales were expected to, or actually did, hit such volume subsequent to the acquisition that tooling-up for any element only then would have been practical.[24] The overwhelming

ignition-parts market described in note 17 supra. It is beyond comprehension that Ford increased its stature for sales to merchandisers by obtaining a distribution network and brand name with which, as the United States views the situation, it can outdo them in the retailer trade. The Government's emphasis upon the small ignition companies, the production capability of which is very limited, makes it difficult to perceive that it is concerned about purchases by original-equipment users, such as American Motors and International Harvester. These customers are obviously interested in buying from companies which manufacture and not merely merchandise some other firm's products. Furthermore, the only evidence on the subject— an isolated document culled from the Ford files—shows that the original-equipment users have need for only a very few items which the little outfits discussed in this opinion even brand, let alone build. This stands to reason, for the small organizations deal mostly in *service parts* (see note 19 supra) for engine constituents like generators and distributors which appear on new machines as complete units. Of course, it is possible that one or more of these present-day merchandisers is a potential large-scale fabricator. However, there

is absolutely no indication that any has either the capital or the inclination to risk it, necessary to put it into a realistic would-be entrant classification.

24. Since they were no longer of any value to Electric Autolite, Ford also acquired the former's inventory of "Autolite"-branded electrical replacements consisting principally of elements for pre-1961 model-year Chrysler vehicles, accounting for no more than 16% of the highway population, for which Autolite had supplied original equipment. Presumably, these components did eventually become incorporated into Ford's all-make line.

While *integration was heavily stressed* in the planning undertaken around early 1959 and has proceeded apace for some elements for Ford automobiles, as of the time of trial the defendant was manufacturing no ignition parts not adaptable to one of its own vehicles. Thus, the all-make aspect of its aftermarket endeavors still rests largely upon outside purchases.

Although Ford's Board Chairman was advised in November 1961 that the appropriate divisions had "completed plans for a fast-moving line of electrical and carburation parts to cover General Motors, Ford and Chrysler vehicles," a memorandum prepared early in 1962 by

probability is that the ignition scheme as initially designed would have come every bit as far in scope as it is today and just about as quickly.

Several people commented on the desirability of handling plugs and batteries with other products. Mr. Filco stated that the former function was a wedge for driving the latter through to warehousers; however, on cross-examination, he contradicted himself by claiming that his organization, which has neither plugs nor batteries, is advantaged by its narrower area of responsibility because it can specialize in solving ignition problems. The General Sales Manager of Champion Spark Plug Company testified that as late as 1962, he, too, favored narrow expertise but now believes that his people could use ignition parts to boost plug revenue. Nevertheless, he refused to say that Champion would take on any, although admittedly it could easily finance them.[25] The President of General Battery and Ceramic Corporation saw merit in its practice of devoting its energy entirely to batteries and a few spark plugs. In the same vein, a spokesman for Electric Storage Battery Company told how his firm had thought about carrying a wide-application collection but decided not to. Although both proprietary- and private-label plugs and batteries are available to small merchandisers, Mr. Filko knew of only one which had seized the opportunity. As of mid-1966, no more than 15% of Ford's Autolite direct accounts stocking ignition parts also bought either of the other two types. The finding is inescapable that the three are not complementary to any significant degree. The defendant's capacity to display them together will not notably strengthen Ford's performance in any. Furthermore, under these circumstances considered in the shadow of the anti-trust prohibitions against tying, it would be unfeasible for Ford to try to overrun its parts opposition by setting its prices on batteries and plugs below the general levels—a maneuver more easily accomplished by a builder than by a mere purchaser and reseller.

Of course, since the acquisition allows Ford to use "Autolite" on different classes of goods, each is lent a hand from the presence of the same name in, and on publicity directed to, other markets. This overlapping effect evokes attention not because of defendant's wealth, for there is no indication of the extent to which it can be put at the disposal of the Autolite Division, a minor aspect of the company's total involvement, but because Ford, as anticipated, does quite well in spark plugs and can be expected to use a percentage of its return there for advertising in that area. In the interest of avoiding redundancy, this train of thought should be coupled with a study of plaintiff's lament over the very transfer of the brand.

In the early 1960's, "Autolite" was familiar; after all, it had been visible under Chrysler hoods for a quarter century. What is not clear is that any name has much intrinsic worth on ignition parts. Identification is of utmost moment, not

the General Manager of the division responsible for marketing them suggests that no final decision had yet been made whether to brand them with "Autolite."

25. This witness's testimony, which in greater detail is to the effect that he was uncertain of his ability to convince Champion's Board of Directors to expand into the ignition-parts field, is particularly significant. The company has the most prestigious name in spark plugs as well as the largest share of the replacement-plug market, although it has been declining rapidly since the acquisition in suit resulted in the firm's

displacement as defendant's supplier. If plugs do have much of a "wedge" effect for other components, the firm's success as a sponsor of an all-make line is practically guaranteed. Its reluctance to carry an assortment cannot be ascribed to the fear that a dilution of its plug expertise among other items will drive traditional buyers to rivals, for both Ford and General Motors, which together with Champion account for 96% of the annual plug business, also sell ignition elements. Since manufacturing capacity is not essential for competitive equality in the ignition field, the investment required for Champion to enter would be minimal.

in any usual trademark sense, but for designating authenticity. To those who stress legitimacy—and they are the majority—defendant's only real selling point is not "Autolite" but its new-vehicle status which Ford could have given any name. Thus, the thrust of plaintiff's solicitude must be toward the struggle among all-make lines. In their submarkets, recognition falls far short of being talismanic, as Electric Autolite's experience portrays. Contemporaneously with the advent of Motorcraft, it teamed up with two other original-equipment suppliers to sponsor a multi-application selection as a joint effort; their progress was not inspiring. Perhaps the Government deems it axiomatic that a well-known brand has magnetism. Logically, the converse seems closer to reality. The real ultimate consumer of ignition parts is not the same fickle housewife who shops with an eye toward compensating the detergent which entertains her with some adulterous affair on television. Although the man on the street buys them, he rarely sees them. Often he is even unaware that he needs them. He leaves his car for an overhaul or routine checkup and comes back to settle the bill. The trick is to persuade not him but the mechanic who, if not an authority, is at least a professional in things automotive, unlikely to be swayed by gimmickry. This fellow wants craftsmanship—and he should not need a trade name to discover it—with low inventories, ample profit margins, easy credit and obsolescence rebates. Therefore, it is not surprising that in the literature the emphasis is on the fewer numbers in one assortment than in another which will fit the same conveyances. Compli-

mentary cabinets and racks to facilitate storage and segregation are common. Executives from the Firestone and Goodyear tire companies, deposed by defendant, failed to mention labeling as a criteria in the decision to offer their dealers United Motor Service replacements exclusively. The paramount factor to them was the series of U.M.S. training centers giving free instruction in proper motor diagnostic and treatment techniques. Refiners, to which it is imperative that filling-station operators not jeopardize gasoline business with shoddy repair work, prefer U.M.S. for the same reason. Witnesses also spoke of General Motors' parentage of 50% of the automobiles on the road and the implication that one stocking U.M.S. will be using genuine components on about half of his jobs. In 1960, Ford's salesmen called upon many rubber and petroleum firms. The summaries of these conferences passed along to defendant's higher echelons reported that the matter of branding came up with four prospects, three of which were said to have thought that "Motorcraft" was satisfactory and the fourth to have talked in the vague language of needing a name with "wide acceptance."

The preceding is the gist of the hard information bearing on customer motivation. That defendant paid for "Autolite" is wholly equivocal because the plug and battery plants could not have been secured without it. The other pertinent material is set out in Ford intra-corporate communications in the form of pure opinions that the infant Motorcraft project should have a "good" name and that modest expenditures should be budgeted to create one.[26] The authors,

---

26. An estimated $176,000 was spent for advertising the Motorcraft line and name during 1960. Promotion consisted primarily of publicity in trade magazines aimed at the wholesaling segment of the market and direct mailings to jobbers, filling stations, garages and fleets (e. g., taxi and cartage companies). This small allocation for the first year of the label's existence indicates a great deal about the thinking relative to brand recognition on

the part of those in a position to make controlling decisions at Ford. The proposed budget for 1961 advertising, to be carried out through basically the same media, was $208,000, with another $144,-000 recommended for catalogues, price lists and monthly distributor newsletters.

By way of comparison, the following table depicts lineage purchases in trade publications for 1960 on behalf of Motorcraft and four other automotive-com-

sometimes anonymous, did not ground their beliefs upon any actual appraisal of sales development predictable as notoriety grew. Upon these unexplained declarations the Government relies almost completely.[27] Mr. Filco was its single living exponent on the aftermath of the acquisition in the ignition field. Although plaintiff asserts that with the annexation of "Autolite" to Ford's other assets the "scale has been tipped decisively" against smaller competitors, he was never asked about the value of labeling. Since his direct testimony consumes a mere nine pages of the transcript, the neglect cannot be attributed to insufficient time or an unwillingness to risk confusion by probing too many topics. Shortly after this trial had been concluded, the Department of Justice told the Supreme Court in another Section 7 proceeding, where the assigned error below had been the allegedly excessive credence given by the judge to statements of company officials: "In our view, management views, at whatever level, should not be the focus of analysis." Brief for Appellant, p. 43, United States v. Penn-Olin Chemical Co., 389 U.S. 308, 88 S.Ct. 502, 19 L.Ed.2d 545 (1967). Irrespective of the soundness of this anti-subjectivism under all conditions, its virtue here is manifest. The solution to the question posed by the sale of "Autolite" must turn upon empirical investigation, for, unlike the situation where the issue is a debated course of conduct as it was in *Penn-Olin,* no official's reflections could modify the economic structure. What counts is buyer sentiment and, in establishing this, the United States has been utterly deficient.

The evidence is in bad shape in another way. Since the object is popularity among garagemen who daily see defendant's engines, the odds are that Ford would have elevated "Motorcraft" quickly and quite painlessly by conferring upon it original-equipment exposure.[28] Electric Autolite had no full-range line of its own in 1961; thus, "Autolite" had no submarket share which it could

ponent, although not necessarily ignition-parts, aftermarket merchandisers:

| | |
|---|---|
| Motorcraft (9 Months) | $161,000 |
| Purolator | 168,000 |
| United Motor Service | 233,000 |
| Carter Carburetor | 203,000 |
| Perfect Circle | 132,000 |

27. In an effort to show that "Autolite" was prestigious as well as widely known, the United States points to a survey made at the request of Electric Autolite in the Fall of 1960 (shortly after the Motorcraft program had been inaugurated) among 91 "accounts" in the Chicago metropolitan area, showing that:

36.3% felt that Autolite "electrical units" were best.

20.9% felt that Delco "electrical units" were best.

3.3% felt that Ford "electrical units" were best.

12.2% felt that Autolite, Delco and Ford were equal.

18.7% felt that Autolite and Delco were equal.

It is hard to believe that the respondents who put Autolite on top were so unsophisticated as to have been oblivious to the fact six months later that their favorite items were carrying the "Prestolite" label and that the "Autolite" components were then largely the same Ford products which they had deprecated half a year earlier.

Of course, the table does not purport to reflect the influence of branding on purchasing decisions. In fact, when the poll was taken, Ford and Electric Autolite sold parts adaptable, for all practical purposes, only to Ford and Chrysler vehicles, respectively.

28. The principal advantage which Ford saw in "Autolite" was the ability to use a recognized name for whatever it was worth on parts distributed through the independent aftermarket without employing the same brand on its assembly line. If it could have reduced this prospect to practice, it would have been able to give its franchise dealers (and, more significantly, its special wholesaling function to them) a limited degree of protection by making the original-equipment label, then principally "FoMoCo," available to them exclusively. See note 21 supra. The defendant actually tried this approach after the acquisition, but was forced to abandon it when word came from many independents that they would not carry any more Autolite Division elements than absolutely necessary if the company continued to take steps to make it more difficult for them to compete with Ford for the franchisees' business.

have brought to Ford, and the take-over did not abort the defendant's potential to cut into its grasp on the trade. Electric Autolite thereafter introduced a multi-purpose package and certainly would have marked it with "Autolite" if it still owned the name. Were branding a cardinal consideration, competitors with labels of low ratings would have been up against two major hurdles where now there is one. There has been no attempt to suggest what this double handicap would have meant to them in contrast to the Ford-"Autolite" union.

The residual facet of the Government's four-pronged attack is the assumption of the Autolite distribution system. What really transpired is much less menacing than the imposing nomenclature used to describe it. Ford received six regional offices, personnel and a list of Electric Autolite's warehousers and jobbers. All of these have been and still are at liberty to deal with anyone they wish. Each old direct account had to be visited individually and, if it consented, be re-signed by defendant. Within a few months, 52 did enter into new ignition contracts. However, 50 of these for the previous year had also been involved in the Motorcraft experiment. They belonged to the Automotive Electric Association and looked upon Ford as a source of genuineness. By mid-1966, direct accounts totaled 156, of which 104 in 1960 had been pledged to neither Ford nor Autolite. The same bloc of 50 had been committed to both. The net increase traceable with any semblance of accuracy to the acquisition is two first-layer middlemen, who may or may not care about Ford's all-make assortment.[29]

A fair assessment of the evidence justifies at most the inference that Ford possibly has benefited from the Autolite bargain. Section 7 is a prophylactic where competitive harm looms reasonably probable and substantial. Brown Shoe Co. v. United States, supra. Apart from attempting to apply the likelihood and significance tests, the Court would face a hopeless ordeal in trying to translate even certain gain to Ford into competitive injury. Although no statistics have been proffered, it is a safe bet that Ford has a large share of the market starring its original-equipment-type line, due solely to the extensive but decreasing demand for factory duplicates and the company's unique capability to meet it. Defendant's all-make success is not susceptible to an educated guess. Yet the advantages suspected by the United States to be fruits of the transaction in suit, if they exist, would be observable only in the wide-application submarkets, where the merits of branding and adjunctive products such as spark plugs and batteries would not be eclipsed by authenticity. Furthermore, unless the harm in the submarkets be of the requisite dimension, neither could be the effect in the markets.

The Government's working premise must be that, given any degree of advantage to defendant, sufficient competitive detriment arises from the fact that Ford is big and some of the opposition is not. Present or trending concentration —indeed, all numerical intelligence—is thus rendered superfluous. However, by adopting this stance it has forsaken recourse to many of the doctrines it previously fought to mold, such as the "ranking rules" of United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) and United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed. 2d 314 (1964). The alarming merger tendency rationale of United States v. Von's Grocery Co., supra, is inapposite. One is even hard-pressed to speak knowledgeably about incipiency, although he

29. Each of the direct accounts which is a warehouse—and most are—may have several dozen affiliated jobbers. Since the latter are free to carry so many of their warehousers' lines as they choose, there is no way of estimating with the evidence at hand the number of jobbers indirectly acquired by Ford for the first time when it re-signed the accounts mentioned in the text. Apparently, Motorcraft accounts had to be signed again by Ford to continue to handle "Autolite" parts for pre-1961 Chrysler vehicles. Cf. note 24 supra.

could conjecture. He might start with the simplistic supposition that size always harbingers an inordinate command. Even the United States senses the inherent unreliability of this thesis when it doubts, albeit without foundation in the record, that defendant could not have averted the collapse of Motorcraft had it not been for outside aid. He could postulate dominance on Ford's car population, which, according to the testimony, influences some all-make clientele. This approach would close the gap left by the Government's reluctance to disclose how similarly endowed firms, like General Motors here, are doing, and, therefore, must be rejected. Perhaps the most tolerable course, although not to the Court, would be to devise some theory about the inexorableness of historical patterns to prophesy from Ford's participation in the vehicle oligopoly that it is destined to repeat this achievement with full-coverage ignition parts.

## III

### BATTERIES

Besides the fact that the relevant technology is widely known and unprotected by patents, automotive batteries have little in common with either spark plugs or ignition parts. Manufacturing facilities can be operated efficiently on a very small scale and their outputs are highly fungible. No component must be designed to exacting tolerances. The only problem in matching a storage battery to an engine is size, and a line of five sizes will satisfy every application. For this reason, there is no overt tendency for a replacement to follow the vehicle maker's choice of brand. The article is heavy and bulky, and in order to avoid prohibitive freight penalties, the nationally oriented producers have plants around the country. On the other hand, because low-volume construction is profitable, some 150 companies compete in regional markets, often as geographically confined as west central Florida or New York City. Service-battery purchasing, occurring at least thrice during the lifetime of the average car, is frequently a spur-of-the-moment affair, immediately preceded by that sinking feeling associated with a driver's impotence at the starter, and is accomplished through the nearest retailer—usually a filling station—on the basis of whatever name happens to be in stock. In instances attended by less urgency a buyer may visit a mass merchandiser dealing over-the-counter under its own trademark, which is invariably able to give the best price. Since labeling is of negligible import under emergency circumstances and outlets of this kind often patronized under others, a large amount of a typical major battery builder's business is for private-brand accounts, which, overall, consume 55% of production. In addition to such famous chains as Sears, Roebuck and Montgomery Ward, many oil companies fall into this category along with localized and coast-to-coast groups of department, hardware, cut-rate, tune-up, and tire and accessories stores. Joining them at a fast pace have been non-integrated vehicle firms, notably American Motors and Chrysler, for both installation and wholesaling to franchise dealers.[30]

Fabricators derive approximately the same net revenue per item whether they sell to these quantity customers or through their own efforts, including distribution expenses, in the aftermarket.

---

30. Sales of replacement batteries through franchise automobile dealers are not great, totaling, according to one reliable survey, only 6% of the aftermarket in 1964. These outlets are often not the most accessible in times of urgency and their prices are higher than those of many competitors. In the early 1960's Ford's wholesale charge to its franchisees was higher than Sears, Roebuck's retail list. General Motors does not even supply its licensees directly but leaves them to procure their requirements through the same independent warehousers and jobbers serving gasoline stations and garages. Furthermore, many franchisee battery sales are not even made in competition with other outlets. See note 38 infra.

Among them five were responsible for more than 80% of the domestic shipments between 1955 and 1960: Electric Autolite, Electric Storage Battery, General Motors, Globe Union and Gould National. While all maintained proprietary insignia, those of the first three—"Autolite," "Willard" and "Exide," and "Delco," respectively—were the most popular. At the end of this period, Autolite was functioning with six well-dispersed factories, of which all but Owosso now belong to ELTRA; a seventh had been decommissioned in recognition of traditionally static demand and the 25% overcapacity problem felt by an industry generally thought, nevertheless, to be in good health.[31]

Due to the essentially standardized nature of the commodity and its perennial adaptability without modification to Detroit's specifications, original-equipment-sourcing habits have not been as fixed in this area as elsewhere. Of course, General Motors' needs have long been met internally. Since the mid-1930's Chrysler relied principally, and on occasion entirely, upon Autolite, but this practice changed drastically in 1956 when it began to turn chiefly to Gould National. Ford regularly called upon several if not all of the Big Five except General Motors in a single year. This practice has continued despite the acquisition, for, in rough terms, Owosso's maximum annual capability is about 2.3 million units, or less than the 2.6 million cars, trucks and tractors with an average of one battery each rolled out by defendant in 1964.[32] At the same time the independent aftermarket swallowed in excess of 1.3 million, and the special franchisee channels more than 0.5 million elements bearing Ford's "Autolite" label. Consequently, three years after the transaction defendant's outside sourcing missed its 1960 total of better than 2.6 million by only about 160,000.[33]

While foreclosure of Ford as a customer, which the Government urges is of considerably greater significance than these computations suggest, is one of the allegations in the complaint, attention should first be directed to the horizontal aspects of the 1961 agreement. Previously, defendant had not been a battery manufacturer; thus, the take-over of the Michigan plant did not give rise to the implications accompanying the classic merger between direct competitors.[34] Illegality cannot be gauged by merely adding shares or figuring the rise in concentration in the line of commerce. A more extensive review must be embarked upon to determine what potential Ford had for becoming a producer without assistance from Autolite and what deleterious result the acquisi-

---

31. A firm surveying the battery industry from the standpoint of possible entry about the time of the acquisition in suit would not have found dynamism its most appealing characteristic:

| Year | Total Domestic Shipments |
| --- | --- |
| 1955 | 35.94 Mil. Units |
| 1956 | 32.76 |
| 1957 | 33.93 |
| 1958 | 31.15 |
| 1959 | 35.14 |
| 1960 | 34.92 |
| 1961 | 35.69 |

32. Heavy diesel equipment generally leaves the factory with two batteries.

33. Ford's vehicle production and "Autolite" replacement sales do not precisely equal the total of defendant's battery output and purchases because of inventory carryovers.

34. Actually, Ford manufactured its own batteries from 1920 through 1927.

tion may have had in light of a possibility of growth in this alternative manner.

Plaintiff begins, and so might the Court, with a look at defendant's 1960 financial picture, showing assets surpassing three and three-quarters billion dollars and net yearly sales of more than five billion. However, if resources alone were the key, Ford, which in the contemporary era has always stood near the very top of the list of America's foremost industrial corporations, would have to be considered a likely entrant into practically any field. While the evidence lacks a precise indication of the degree to which the firm's holdings could have been dedicated to or hypothecated for any new venture, it does prove that Ford was seriously exploring opportunities for automotive and allied expansion as well as for diversification. From this activity and the enterprises under examination, the inference is plain that defendant could have borne the relatively small outlay and obtained the little expertise necessary to commence a battery operation. Ford's main line of endeavor did foster a special interest in batteries, yet it could have conveniently supplied itself but still have avoided what for present purposes is the really meaningful risk of seeking the favor of other, smaller buyers less able to ward off the evils of insufficient competition.[35] Only one preliminary study was made —in 1960—and the ensuing revela-

tions about prospective profitability were highly discouraging and depicted Ford as a potential contender in a most remote sense. In the face of defendant's target of 15% net after-tax return on new investments, this estimate pegged earnings at 5.5% of capital employed. Furthermore, the dismal projection, formulated with a multi-plant network in mind, was contingent upon a 10% penetration of the market over and above in-house and franchisee requirements. Apparently the only option to a full national undertaking contemplated was a single-facility program to furnish about a third of the assembly-line quota; this was calculated to pay back 3.1%. These forecasts, not dependent for their pessimism upon temporary conditions or severe startup costs, came at a time when Electric Autolite, through both proprietary and private labels, commanded slightly under 10% of the replacement custom. Ford had no peculiar advantage suggesting a likelihood that a one-tenth goal was easily attainable. Although "Delco" is the leader in the aftermarket, this achievement seems generally unrelated to its new-car association at General Motors; "Autolite's" share there was in the proximity of 4% in 1959 and 1960 just as it was being disengaged at Chrysler, which, incidentally, did not include batteries among the electrical items it was integrating. Requests for original-equipment replicas as such have been miniscule.[36] Defendant's

---

35. Another consideration diminishing the importance of Ford's battery requirements in assessing its standing as a potential competitor is the fact that it would have been a relatively simple matter for fabricators to keep car and truck builders happy and still act in a very anti-competitive fashion throughout most of the market. Excluding General Motors production for use on its own assembly lines, original-equipment battery purchases in 1960 amounted to about 18% of total industry shipments. Of course, the price charged for them may have been quite independent of that for service units.

36. The Government is intrigued by decals which have been placed on Ford

engine blocks since the acquisition, reminding owners to use only genuine "Autolite" replacement parts. In determining whether original-equipment status has any real significance in promoting replacement-battery sales, this Court would prefer to look at more unequivocal evidence, such as the fact that some 12% fewer direct accounts are stocking "Autolite" batteries today than were carrying them shortly after the acquisition. In the case of spark plugs, where there is a definite acknowledged tendency for service items to follow by brand their initially installed counterparts, "Autolite" has experienced a gain in such accounts since 1961 of 50%, inferentially in

factory-installed brands in the late 1950's, e. g., "ThunderPower," available exclusively through its dealers, serviced a mere 6% of the Ford vehicles on the road. "Exide" and "Willard," handled by many types of retailers but having virtually no background of new-automobile affiliation, ran fractions of a point behind "Autolite" in a 1964 survey. In short, Ford's reaching 10% meant, in all probability, that it would have to secure much private-name business, just as every maker except General Motors with anything approaching an impressive standing has done. For this struggle defendant was particularly unsuited because many of the private accounts are rivals in car, truck and tractor construction.

■ These considerations demonstrate primarily that Ford was far from the brink of expanding internally and, secondarily, that its potentiality may have had an imperceptible influence upon the industry as already composed, functioning at three quarters of peak load and unshielded by any significant barriers against newcomers, which, unless they had more ability than Ford seemed to, were liable to end up simply additional numbers. Thus, this case is quite distinguishable from FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), and United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), wherein the Court noted the undeniable concern over the plans of extraordinarily competent outsiders on the part of current competitors, which presumably moderated their prices so that invasion would seem less inviting. The Government has not attempted to analyze quantitatively the effect Ford may have had nor even to establish that the ranks

of conceivable entrants—and, on balance, this is all Ford was—were thin or that some of the 150 small outfits were not themselves toying with the idea of going into new territorial markets. Instead, plaintiff espouses a *per se* rule that the removal of any bystander, regardless how weak its impact, in the context of concentration is violative of Section 7. The law has not gone so far. See United States v. Penn-Olin Chemical Co., 246 F.Supp. 917 (D.Del.1965). Nevertheless, there is no cause to pursue this tact.

Ford did not extinguish its potential. From the standpoint of manufacture, it neither joined with nor substituted for a going company. Electric Autolite (ELTRA) was left where it had been, as the fifth-largest firm, and in possession of most of its capacity together with the money and a base for growth as the occasion arises. For the moment anyway, it also retained performance substantially untouched, averaging 10.-1% of the industry total in the period 1962–64, down only 2.8 points from the average for the years 1958–60. Defendant took the one realistic route open to it by obtaining a respected name to insure a chance of success and to make an expenditure on hardware worthwhile; however, it is far from a fully matured fabricator. Besides the half of the immediate demand which Owosso cannot satisfy, there is vast room for improvement in strategic location. Today Ford fills the bulk of the orders from warehousers and jobbers with outside purchases. It has already announced its intention of starting up a new factory in Louisiana. More are in the offing if Ford is to become an efficient country-wide force—and if defendant's potential was for only the Michigan area, it was obviously of little value.[37]

recognition of its appearance on many more new vehicles now than when it was affiliated with Chrysler.

37. The instant situation is comparable to that which would have existed in FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), had the geographical market under con-

sideration there been just the entire country, as it is here by stipulation, and had Procter, the potential entrant, taken over not the largest existing concern in the household liquid-bleach industry but one or several of the 200 less formidable firms with shares averaging approximately 0.1% apiece.

Certainly the transfer of "Autolite" did not subvert the known competitive structure. On this record defendant is powerless to do more for the name than did Electric Autolite with Chrysler exposure—about 4% of the replacement-battery total.[38] 1964 research into householder buying, which compiled the most authoritative comparative data, assigned it 2.3% and placed it sixth, 16.2 points behind frontrunning "Delco," in a field in which the first five labels aggregated 51.7%, but the following eight only 12.7%. Among filling stations, where a third of all sales to individuals are rung up and the brands of mass merchandisers infrequently handled, it came in eighth with 1.1%. In no class of outlet did it surpass 8%.[39] "Prestolite," the sole proprietary mark of Electric Autolite (and ELTRA) since 1961, is less familiar than the one relinquished, although by 1964 it appeared on approximately 1% of all replacements and, according to the evidence, will gain in the independent aftermarket substantially as fast as any that Ford

may have founded there. In the perspective of these statistics, coupled with information that one consumer in twelve specifies a name and one in a hundred is so adamant that he will refuse all others, at worst ELTRA has suffered minor harm. Detecting injury when the inquiry is framed in the appropriate language of competitive deterioration is exasperating in its futility. The emphasis today is on the private labels. As a practical matter they are never stocked side by side. Each of the prominent ones belongs to a particular chain and in large measure reflects the owner's reputation as a tire, accessories or gasoline vendor; or, in the case of "Allstate" (Sears, Roebuck) and "Riverside" (Montgomery Ward), the benefits of low distribution and pro-rated-overhead costs. Only four proprietary insignia are among the foremost thirteen according to the 1964 poll: "Delco" (18.5%), "Autolite" (2.3%), "Exide" (2.2%) and "Willard" (1.8%). Whatever bothersome bunching-up there is involves "Del-

**38.** Defendant could sell more "Autolite" replacement batteries than did Electric Autolite just prior to the acquisition because in 1960 Chrysler was not making the brand available to franchise dealers whereas Ford is today. (On the other hand, this gain is offset partially by the loss of sales to licensees of the four firms mentioned below.) From the standpoint of the label's competitive importance, any increase in this regard is negligible. First, franchisee purchases from Ford, which aggregate about 500,-000 units a year, are often not redistributed in the traditional sense but are used to service trade-in automobiles before they are placed on used car lots. Second, what orthodox retail business is done invariably reflects a demand for maintenance by Ford factory-sponsored mechanics rather than for any name. For the same reasons, even though defendant before 1961 had been supplying franchisees with batteries under its private labels, adding the penetration of these old brands to that through independent outlets gained by virtue of the acquisition of "Autolite," does not give a realistic picture of the company's new aftermarket position.

From the standpoint of original-equipment customers, most of which are in competition with defendant in the car, truck or tractor markets, "Autolite" would now be a generally undesirable brand. The four major buyers in this category dealing with Electric Autolite under this name in the pre-acquisition days—Chrysler, American Motors, International Harvester and John Deere—today use either "Prestolite" or a private label and source to manufacturers other than Ford.

**39.** This survey, conducted under the auspices of "Look" Magazine and considered one of the most reliable industry indicators, is used only to show relative brand standing. It does not purport to depict the total share of any one name other than in the replacement market for family automobiles. Doubtless it covers the area in which labeling is of the most competitive significance even though it does not take account of individual sales for trucks, farm implements, marine and miscellaneous equipment and bulk purchases by trucking companies and other automotive fleets. "Autolite's" best showing (7.3%) was in sales through garages. Therefore, its stocking is probably heaviest among outlets of this type, which did 8.6% of the family business in 1964.

co," "Allstate," "Riverside", "Wizard" (Western Auto Stores) and "Atlas" (Standard Oil), the five with the 51.7% cumulative share. Excluding this quintet, any but an ivory-tower theoretician would hesitate to proclaim the feasibility of a more diffuse consumer-goods market. For the acquisition to have noticeably jeopardized the reduction of the concentration which does exist, either of two absurd assumptions is indispensable: that Ford, if it were to make a grass-roots entry, would do better by introducing a trademark previously unheard of in the arena than it will with "Autolite," or that after years of watching "Delco" predominate, ELTRA (Electric Autolite) will suddenly find the strength, somehow denied to defendant, to stem the tide but will falter without the old name.[40]

The nature of the distributorship assignments to Ford is described in Part II. By the Fall of 1961, 831 direct battery accounts had recontracted, although 298 of them were lost by mid–1966. Presumably, ELTRA and Ford can grant identical terms to middlemen, to which, therefore, the distinction between the two must lie in "Autolite." ELTRA has been set back insofar as it is cut off from wholesalers who are content with "Autolite" and undesirous of adding "Prestolite." Competition may have sustained a blow only if good distributors are scarce, as they seem to be, so that the unavailability of those who do not want an extra line would be an oppressive handicap *and* if defendant, were it to inaugurate a label, could be expected more readily than ELTRA to persuade those carrying "Autolite" to take on another kind as well, e. g., if original-equipment identification were a significant factor in advancing sales.[41] As a conceivable entrant, Ford, by definition, had latent appeal to some warehousers and jobbers. Of course, ELTRA has distributors today. There is no sound basis for contrasting the sizes and expansion characteristics of the two groups, one real and the other conceptual, on the evidence at hand.

The critical feature of the Government's case is "Autolite" rather than Owosso, which is so clearly inadequate to diminish any important battery potential Ford may have had. Thus, the United States must prove that defendant could have given birth to a brand, which, working in opposition to "Autolite," would probably do more good for the market than does this label juxtaposed with "Prestolite." See United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). Given "Autolite's" quite unspectacular pre-1961 showing, which "Prestolite" could well match in a few years, plaintiff bore an *imposing* burden from the outset. It failed formally when it could adduce no evidence that Ford has special talents conducive and adaptable to exalting trade names and to overcoming the general apathy toward them. Where abundant indications point the other way, the Court will not read into "Delco's" achievements a correlation between initially equipped vehicle population and aftermarket volume, absent testimony sufficient to weld the link. It will not latch on to Ford's wealth and surmise

40. Because of the state of the evidence, it is unnecessary to consider the appropriate approach if it appeared that Ford's original-equipment affiliation or other qualities not inherent in ELTRA or associated with "Prestolite" forecast notable success in the aftermarket, which would have been augmented by the addition of the small consumer market loyalty tied to "Autolite."

41. As a result of the acquisition the demand upon independent warehousers and jobbers for "Autolite" batteries could increase only if Ford franchise dealers decide to purchase from them rather than from defendant's whole-saling divisions now that the original-equipment brand, which prior to 1961 had been "ThunderPower" or a similar private label, is available through more than one channel. Even if the licensees' sourcing patterns shifted completely, the number of units involved would total only about 500,000 annually, or some 1.7% of the entire replacement market. On this record, nothing else will improve "Autolite's" appeal to middlemen.

that therein lies the seed of brand power, when, for all that appears, ELTRA is every bit as capable of launching a massive campaign of any appropriate sort, from discounts to media publicity, if there were merit in this course despite the steady downward trend of proprietary labels and the counterbalancing emphasis on private accounts as the backbone of the battery enterprise.

■ Much the same understanding of the situation which undermines the United States' contention that the acquisition had adverse horizontal consequences constrains acceptance of its supplemental view that detrimental vertical effects are likely to be of enough magnitude to warrant condemning the arrangement. Because Ford is now a battery manufacturer, the Government maintains, other producers sooner or later will be denied the chance to deal with what in 1960 was one of their very best customers, actual or hopeful. Admittedly, the foreclosure so far has been *de minimis*—160,000 units in 1964 in comparison with defendant's 1960 procurements and about all that can be anticipated with Owosso's 2.3 million capacity.[42] However, in a strong economy, Ford should build at least 2.5 million vehicles annually and send 500,000 batteries to franchisee repair departments. Requirements equivalent to the sum of these last two figures are at present obtained largely from other companies but could be met internally if more plants are constructed. Thus, the problem takes on complexities not brought to the surface in the decisions relied upon by plaintiff, e. g., United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Since Section 7 prohibits not every foreclosure but only those stemming from stock or asset transactions, the issue becomes whether the instant combination will probably spawn additional factories.

That one is already on the drawing board is suggestive of an affirmative response. While post-merger planning cannot be determinative, the steps taken by Management here confirm the course shown by other relevant factors to be the reasonable choice of informed commercial judgment. The controlling consideration is the essence of what defendant received. Owosso does not lend itself to proliferation, having given Ford no technology or meaningful savings helpful in further integration. The relationship between it and any future facilities will be temporal rather than causal. Caution is in order lest every purchase of surplus machinery preceding greater expansion be misconstrued as the reason for the progression instead of part of a design which would have been executed as satisfactorily without assistance. "Autolite" is a different story. This name brought Ford into the independent aftermarket with an assured penetration of about 4% *ab initio*. It guaranteed goodwill with trade loyalty from the start, thereby alleviating the door-opening difficulty confronted by any new firm. Defendant took over from Electric Autolite an entire going business as surely as if the pair had merged. Although Ford subsequently has been engaged in this business, the "Autolite" independent aftermarket, on a national scale to the extent of 1.3 million batteries annually, 1.9 million of Owosso's 2.3 million units in 1964 went to Ford assembly divisions, primarily in the Detroit area. The bulk of its service volume, including that through franchisees, beyond the normal transportation range from Michigan has been obtained elsewhere with a loss to defendant of a manufacturer's profit. If it is wise to fabricate a por-

---

42. 160,000 units computed in this manner is an easily ascertainable and substantially accurate figure for present purposes to express the extent of foreclosure as of 1964. This is true even though Ford's Detroit assembly-line requirements, which, due to the proximity of Owosso, give rise to most of the foreclosure, expanded more rapidly between 1960 and 1964 than did the aftermarket, where, because of shipping costs, defendant's participation has been largely on the basis of outside purchases even when, as in 1962, Owosso was operated below capacity.

tion of the total needs, the uncontradicted inference is that full production is even smarter over the long run where scale can be flexible and monetary outlay conservative.[43] Therefore, augmented and, because of freight penalties, scattered facilities are the foreseeable eventuality. Furthermore, a fair share of the investment which was projected by the 1960 preliminary investigation into battery opportunities to earn 5.5% has already been made in the form of working capital to finance inventories and credit for current replacement sales. Therefore, the rate of return could well be improved on incremental fixed assets, estimated at a net cost of four to ten million dollars for a seven plant series depending upon the size of each. Indeed, this study suggests a much more enticing yield—now the difference between buying and making—if Ford can stay within the operating-expense framework which was employed as a guideline by the author of the 1960 report. In any event, the risk in enlargement today is lower than that of de novo entry in 1960; the demand for the output of any new installations will be pre-established by "Autolite's" past performance as Ford property. Foreclosure is clearly in sight. It may be gradual and never become complete because some sections of the country may not support a factory. However, it appears inevitable for the majority of the almost 2.5 million units, or about 6.2% of 1964 industry shipments, presently bought by defendant and, therefore, must be treated now as substantial. See Brown Shoe Co. v. United States, supra.

▮ Defendant retorts that even if an absolute denial of access to Ford should follow in the wake of the acquisition, this obstruction is irrelevant unless it "affect[s] the competitive viability of the suppliers constituting the consumer alternatives in the industry." While the continuing vitality of all of Ford's old sources is undisputed, the foreclosure has not yet reached the ultimate stage. More fundamentally, "remaining vigor cannot immunize a merger if the trend * * * is toward oligopoly." Id. 370 U.S. at 333, 82 S.Ct. at 1528. It is said that there is no illegality because no battery manufacturer has been merged from the scene to reduce any buyer's options. The harm here is less dramatic than the outright demise of a producer. The concern is evaporation of patronage, the stuff of economic life, more important to younger and smaller organizations in the guise of possible clientele than to the entrenched firms lucky enough to have dealt with Ford previously. The little but dynamic and aggressive contender may be deprived of the motivation afforded by the lure of landing a big account and, thus, of the inspirational impetus to modernization and innovation which can make it more forceful throughout the whole market. However, this is neither the time nor the place to rehash all pros and cons of vertical restraints. It suffices that the latter have been held the more compelling. E. g., Brown Shoe Co. v. United States, supra. Ford's position that invalidity does not occur apart from a "[reduction in] the number of effective consumer alternatives" neglects the fact that Section 7 talks of the lessening rather than of the decimation of competition. The statute raises questions of efficacy not susceptible of resolution by a headcount and tests the atmosphere for its benignancy toward the development of marginal and prospective entrants. Compare Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Obviously,

---

43. With specific reference to ignition parts for non-Ford cars, the Director of defendant's Business Development Office at the time of the acquisition was asked whether in his opinion it would be feasible for the company to sell items which it did not manufacture. He responded, "On a long-term basis the answer is absolutely 'no' * * * I don't feel that on any kind of a terminal [extended?] basis you can ever make a profit—I don't think you could stay in business by buying and reselling. In other words, you put another step in your distribution. I don't think you can afford it." Tr. 2046, 49.

the air is fouled when a buyer like defendant vanishes, shrinking in the process the call for batteries by as much as 6%, or by a more disturbing proportion when adjusted for the long-standing loss of General Motors as an outlet. This is particularly true where the market exhibits no sign of burgeoning and where its occasional spurts in activity are typically attributable in good measure to an upswing in the fortunes of vehicle builders, chiefly Ford and General Motors. Moreover, the foreclosure impends just when General Battery and Ceramic, ranking a poor sixth in 1960, has become a countrywide fabricator, presumably heightening its appeal among purchasers with supra-regional interests.[44]

█ The next aspect of defendant's rebuttal protests that since now both Ford and ELTRA are formidable battery manufacturers, deconcentration has taken place through the introduction of a new consumer alternative. Given defendant's elementary explanation of Clayton Act objectives, simply the stabilization of the number of competitors, it would naturally hail the acquisition as a blessing. The practical response is that, were the proposition sound, this might be the last backward-integration case; Section 7 could be skirted by a circumspect selection of assets provided they are not crucial to the vendor's survival. Compare United States v. Philadelphia Nat. Bank, supra, 374 U.S. at 370, 83 S.Ct. 1715. More important, any "deconcentration" as an effect of the transaction is fictitious. To be sure, there has been better allocation since 1961, but only in a very technical sense. The 150 producers with 19.2% in 1960 did 2.5 points better in 1964; but the increase was no more connected with the Owosso incident than their slip in 1962

to 18.6%. The realignment flowing from the transfer was a shift in defendant's sourcing, which remained quite constant in amount for reasons mentioned above, to Electric Autolite (ELTRA) to a greater extent than before, pursuant to a contract negotiated with this end in mind by the two parties while they were hammering out the details of the acquisition. Whereas during the 1950's five manufacturers were in command, these, plus Ford, reign today, although defendant was at the bottom of the hierarchy with 5.8 of the almost 80 percentage points accumulated by all of them in 1964, and most of the 5.8 represents defendant's new-vehicle battery use. The prescription for the industry is not simply for more members. Absolutely speaking, there are plenty already. What would help is a newcomer able to attack the leaders, and Ford seems to bring little to the task. It seems unlikely that Ford can advance "Autolite," and defendant appears to have less than average qualifications for making headway in the private-label field. If defendant continues to distribute its outside purchases as it did in 1964, the aftermath of plenary foreclosure would be the depression of fifth-place ELTRA, the overall share of which would have been 5.7% instead of 10.5% in that year but for Ford's needs. Were capacity starvation the malaise overhanging the market, ELTRA's freedom to seek out new business could be beneficial. The prevailing sickness is demand deficiency. Of course, defendant's other traditional suppliers—Electric Storage Battery, Globe Union and Gould National—would miss Ford, too, although most of their tears would have been shed in 1961 when defendant sealed the alliance with ELTRA for requirements as well as fixtures.[45] Thus, their

---

44. There is no indication in the record that it is necessary for a battery producer to have a countrywide plant network in order to secure at least a portion of a major national account. Since the product is so standardized, it can presumably be purchased by one customer from separate sources in different regions, and, indeed, appears to be in some instances. On the other hand, during the period for which information is available, Ford never bought from a sectional manufacturer.

45. The contract, which provided that defendant would purchase from Autolite "approximately 45% of Ford's total requirements of batteries for production

shares aggregating more than a third of all output would decrease slightly (even if that of General Motors, roughly double any of the other three, would be unaffected.) "Concentration" does not border on the obscene because it denotes perversity; the connotations are bad: dictation over prices, service and admissions to the industry. Therefore, gross market shares can be deceptive where they include a corporation's interdivisional dealings. The battery users who feel the results of concentration are those without their own plants. To these, complete exclusion of Ford could easily mean no change or even a rise in the combined influence of the four industry leaders: Electric Storage, General Motors, Globe and Gould. Going into 1961, defendant was purchasing at an annual rate of almost 2.3 million units for original equipment. When the acquisition in that year threatened foreclosure, the "open market"—at that time, all shipments minus those for new General Motors cars, trucks and buses—braced for a decline in this amount, or by 7.3%.[46] On the other hand, the drop in the "open market" volume of the four attributable to a loss of Ford's assembly-line trade would have been estimated at 7.5%, and of three of them, including the first- and second-ranking firms, at only 3.2%. In brief, they were keeping their grip as a body and, in the three instances, tightening it as individuals while Electric Autolite was dividing its stake with defendant.

Unfettered backward integration should be permitted, Ford claims; for otherwise it is a pawn of its suppliers to the extent of the disparity between the cost of purely internal expansion, a route which no one disparages its right to travel, and the approach it chose in this instance. The fallacy is in the unexpressed premise which either equates Ford's best profit posture with the good of untold persons to whom each path to production is closed or else disregards their welfare entirely. Myopia also clouds the residual argument that the unbridled liberty to integrate backwards is a spur to competition, except where rivals could be deprived of scarce raw materials or parts. The rationale treats Ford as an invisible competitor with outside component builders which are displaced from time to time when they cannot offer the advantages of inside fabrication. Nevertheless, low prices are not in themselves always indicative of maximum consumer protection. Compare Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). When the charge to vehicle makers for factory-installation batteries, comprising a small segment of the line of commerce, may not be keyed to the generally prevalent rate, what defendant pays is irrelevant.[47] Moreover, continuing supplantation of a company with which it was dealing is not an assurance that defendant can do the job more cheaply; it could imply that the traffic in the well-integrated, triopolistic automobile market will bear Ford's inefficiency in making given elements.

and service," was due to expire with the conclusion of the 1964 automotive model year. Whether it has been extended formally or informally is not shown. The statistics in evidence depicting Ford's battery sourcing by company only run through 1964, when it bought 1.84 million units from ELTRA and 630,000 from other outside producers. The Government has not attacked this agreement and it plays no part in the outcome here.

46. Although the precise number of General Motors-produced batteries transferred to one of the company's assembly divisions in a given year is not apparent in the record, the figure can be reliably estimated by assuming that it equals the output of GM cars, trucks and buses, statistics relating to which are available, for any period. Apparently, GM was the only battery-integrated vehicle builder in 1960.

47. See note 35 supra. Ford has not claimed that integration will improve battery quality, assure an otherwise dubious supply or in any way improve the firm's competitive ability in the vehicle markets.

## IV

### SPARK PLUGS

A spark plug is a composite of two electrodes encased in a steel shell overlayed for about half its length by a ceramic insulator. The pair of leads is separated at the very bottom (tip) of the device by a gap calipered in hundredths of an inch. The exterior of the shell just above the tip is threaded so that the lower portion of a plug can be screwed into each cylinder chamber of a gasoline-driven machine.[48] When the unit is properly inserted, one electrode acting as ground is in contact with the engine block while through the other runs a current from the generator, stepped up to high voltage by the ignition coil. Upon reaching the tip the electricity jumps the gap to ground and gives off a spark which fires a volatile mixture of fuel and air inside the cylinder. The combustion forces the piston downward and the attached crankshaft to turn, thus creating the mechanical energy for propelling anything from lawnmowers to powershovels, but primarily cars and trucks. Although spark plugs look fungible to the layman, in fact they are delicately engineered for specific motors with special attention devoted to operating-temperature characteristics. A plug absorbs a great deal of heat from the chamber, which must be passed to the outside at a precise rate. If dissipation is too slow, the electrodes burn out quickly, but before they do, give rise to pre-ignition, causing warping or perforation of the piston head. On the other hand, the heat cannot be released too fast, for the tip has to remain warm enough to burn off post-combustion carbon residues lest the gap become clogged and the sparking function inefficient. While the optimum temperature range of all plugs is between 700° and 1800°, maintaining this span within an engine of a particular year or style depends upon how hot it gets under varying load conditions. Hit-

ting upon the appropriate formula of insulator ingredients, conformation, size and spacing in relation to the shell to achieve the desired spread is a matter of trial and error, requiring on the average three to six months of experimentation. If the job is to be done to the satisfaction of the vehicle builder, which, of course, approves all components it uses, the project is expedited by collaboration between the company and personnel from the original-equipment source, who work together on prototype engines, frequently 12 to 18 months before they are mass-produced. Other plug makers wishing to participate in the aftermarket must do the best they can to prepare in the time they have once the motor arrives on the showroom floor. However, all active brands do appear on a full line for cars of every variety, and normally function well in all cars.

Champion Ignition Company founded the plug industry around the turn of the century. In 1909 its assets, with the exception of the "Champion" trademark, became the property of what is now General Motors Corporation and formed the basis of GM's AC Division selling under the "AC" label. "Champion" was acquired by the ancestor of the modern Champion Spark Plug Company. For the next three decades General Motors and the Champion interests were responsible for more than 90% of all output, with two thirds of this share attributable to the latter. In 1936, having been assured that it would receive Chrysler's patronage, Electric Autolite constructed the Fostoria plant. Between 1940 and 1960 it accounted for an average of 15% of all domestic shipments, while Champion and General Motors held on to 80%.

The historical highlight of the business has been the stability of assembly-line sourcing. Besides taking care of itself, General Motors sold to Chrysler until the advent of Electric Autolite. From 1941 to 1961 Chrysler bought ex-

48. The line of commerce as stipulated by the parties excludes spark plugs for diesel and aircraft engines.

clusively from this youngest member of the triumvirate. Between roughly 1910 and the transaction in suit, Ford purchased only from Champion or its predecessor. Both Chrysler and Ford used their suppliers' labels. Broadly speaking, the cement solidifying these relationships was a dearth of competition. Actually, this description of the phenomenon greatly oversimplifies an understatement of reality. In order to discourage Ford from integrating, Champion in 1920 offered for factory-installation plugs the "six-cent price," profitless in the short run, which has not fluctuated a mill since. Although expenses rose in the interim, Champion was still charging $.0588 in 1960, or, by then, approximately one third the cost of manufacture. General Motors swiftly adopted a virtually identical procedure towards original-equipment customers, as did Autolite in 1936. The practice soon came to cover, as it does today, both light- and heavy-engine fabricators, and weathered a Robinson-Patman Act attack stemming from the differential between six cents and the warehouse-distributor net for aftermarket plugs, at the time about thirty cents. See Champion Spark Plug Company, 50 F.T.C. 30 (1953), Electric Auto-Lite Company, 50 F.T.C. 73 (1953), General Motors Corporation, 50 F.T.C. 54 (1953).

This tremendous discount is neither altruistic nor insane. The overwhelming majority of replacement plugs are dispensed by a mechanic; the over-the-counter trade is not great. Since the fear of serious damage haunts an improper choice of service unit, he has a propensity to stick with the brand sanctioned by the builder of the motor on which he is working.[49] On the other hand, this tendency, more psychological than technically necessary, is not absolute; "Champion" long controlled half of the aftermarket while Ford had around 30% of the conveyances on the highway, and 40% of "Autolite's" volume there was for non-Chrysler applications.[50] What usually causes the breakdown is an opposing reluctance to enlarge inventories. Although a few of his customers may specify a different name, when the repairman deviates, it is generally because he does not have the most appropriate kind in stock but has another, which will almost always be one with original-equipment ties to a very popular car. Thus, the Government concedes that American Motors, with approximately 5% of the automobile market, which uses "Champion" and until 1961 employed "Autolite" as well, is too small to "support" a label by itself. The six-cent price pays for the factory exposure felt by everyone acquainted with the business to be a vital prerequisite for a newcomer to obtain more than a minimal claim on the average of five plug changes (in sets of six or eight according to the number of cylinders) generated by each new vehicle.

Few except Electric Autolite ventured into the field after Champion and General Motors divided it. Of those which did, none ever surpassed the 2% level. Several have come and gone. Firestone Tire and Rubber Company merchandised "Firestone" replacements for 35 years before it gave up in 1964. Although it owned some 800 accessory stores and successfully wholesaled other items to

49. In support of the strength of the custom for replacements to follow original installation by brand, an executive of the Firestone Tire and Rubber Company testified that although at one time the managers of the several hundred retail outlets owned by the firm were prohibited from stocking any but the now-defunct "Firestone" label, "in most cases" they would go out specially and procure for maintenance work another name from a local distributor.

50. Some, although not much, of the disparity between "Champion's" performance and Ford's car population stemmed from the fact that this brand had a tight hold on the original-equipment market for small-engine plugs and, consequently, was the principal label stocked by such outlets as marine dealers.

American Motors-application "Autolite" plugs comprised an insignificant portion of the brand's aftermarket volume.

more than 50,000 shops and filling stations, it could not surmount the patent discrimination against brands not blessed with Detroit's approbation. Goodyear Tire and Rubber Company quit in only three years. Globe Union, a fabricator which had barely 1% of the nation's shipments, withdrew in 1960. Apart from those with substantial new-car association, the most noteworthy emblem in the aftermarket in 1966 was "Atlas," sponsored by the Standard Oil companies, with 1.4% of all service elements. "Prestolite" and Sears, Roebuck's "Allstate," 0.2 points off this pace, were next, followed by Montgomery Ward's "Riverside" with 0.6%. Several dozen others, belonging chiefly to hardware and cutrate chains and farm-implement firms, attained a combined total of 2.4%. Most of the manufacturing for the private labels among these marketers is done by ELTRA and General Battery and Ceramic Corporation, the only producers of any stature at all after the Big Three.[51] Since the article is light, transportation over long distances is not a problem; and one foreign concern, Robert Bosch, GMBH, exports small quantities from Germany for American consumption with the emphasis on replacements for European automobiles.[52]

At no time within recent memory prior to 1961 was less than 96% of the country's output attributable to Champion, Electric Autolite and General Motors. This figure also very nearly equals

their proprietary-brand performances. Champion's share rarely dipped below 50%, although it was on a fairly steady decline of modest annual gradation. Autolite with 15% was indubitably in a comparatively weak position. A minute percentage of retailers, the bulk of which are filling stations, garages and tune-up shops, handled "Autolite" exclusively; and too often it was the optional extra among repairmen who preferred to carry only one or two varieties.[53] Despite the disadvantages under which it labored, the plug line had been one of Electric Autolite's most rewarding. However, the mood in 1960 was not optimistic. Management was worried that Chrysler's phaseout of numerous electrical items would be extended to plugs. Moreover, Champion had just become a public corporation and for the first time published a financial report which, the feeling went, probably came as a real awakening to defendant; for it showed an outstanding income derived in no mean measure from the invaluable promotion Ford had provided for 50 years. That in light of this information defendant would integrate and leave Champion desperate for Chrysler's endorsement loomed as a distinct possibility. The spark-plug goodwill, established by millions of dollars of publicity, could become quite worthless should the Chrysler affiliation be lost and, with it, practically the only motivation anyone had for keeping "Autolite" on his shelf.[54] In addition, the plug fa-

---

51. The record mentions four or five other spark-plug producers, about which nothing is known other than that two of them apparently have their own ceramic-insulator capacity and, in 1966, their outputs aggregated about 1.2% of the nation's total.

52. Of the 4.5 million spark plugs shipped to this country by Bosch in 1964, 55% were sold to franchise dealers selling German-made Volkswagens.

53. According to a 1966 Ford-sponsored survey of gasoline filling stations in major metropolitan areas, only 2% of the respondents stocked "Autolite" exclusively, while the figures for "Champion" and "AC" were 17% and 13%, respectively. 72% of all metropolitan stations carry-

ing "Autolite" did so in conjunction with *both* of these other brands.

54. Spark-plug advertising is directed toward the general public, and, in comparison with ignition-parts promotion (see note 26 supra), is quite heavy. Unlike many ignition parts, spark plugs are frequently changed at mileage intervals rather than when the driver encounters some unrecognized engine difficulty. Thus, he is more likely to be aware of what is happening when a new set of plugs is installed. Furthermore, plugs are not buried deep inside the motor and, thus, are visible to backyard mechanics. Speaking on the subject of publicity, an Electric Autolite sales brochure prepared for presentation to Ford around

cility at Fostoria could not be run on a reduced scale; thus, unless it was to be scrapped, an original-equipment customer was an economic *sine qua non*. When a redoubled assault failed to improve the aftermarket situation and Ford refused to dual-source to Autolite and Champion, the wiser decision seemed to be to get out while the getting was good.

Champion was victorious at Chrysler when the acquisition ousted it from Ford. Although Fostoria's successor, at Decatur, Alabama, was operational in 1962, Electric Autolite (ELTRA) never regained the account. At present ELTRA is reminiscent of the theatrical aspirant waiting in the wings for the star to break a leg, contenting himself in the meantime with bit parts. It sells to the private-brand merchandisers and distributes under "Prestolite" wherever it can, all for 1.2% of domestic shipments in 1964.[55] Because of the meager demand to date, ELTRA has not been justified in baking insulators internally; instead, it gets these most sophisticated plug components from Ford. However, its current debilitation is not to suggest that ELTRA is beyond redemption. Clearly, it has an aggressive spark-plug organization with respected expertise. Ceramic capability is easily within reach whenever revenue warrants the expenditure.[56] Yet, even though Chrysler now considers ELTRA an acceptable supplier, the dif-

ficulty in dislodging Champion is monumental. Champion's unexcelled promotional campaigns are good for the franchise-dealer replacement trade. In addition, Champion has made a revolutionary concession in agreeing to furnish, starting in 1964, one quarter of Chrysler's assembly requirements under the latter's own "MoPar" brand, but still at six cents each, and, in effect, to subsidize an attempt to gain a foothold for "MoPar" with an eye toward eventually stripping "Champion" of the last vestiges of major new-automobile status. Barring a classic blunder, Champion's tenure seems secure for the near future.

The Government again utilizes a pincer strategy, challenging the acquisition from both a horizontal and a vertical standpoint; but the distinction between them is less sharp than in most cases. Unable to traverse several of the pivotal factual premises underlying plaintiff's contentions and hesitant about the validity of others, much of the defense speaks in the tenor of a demurrer. For instance, Ford admits it was a potential *de novo* spark-plug producer in the late 1950's, but denies that the assumption of Fostoria and "Autolite" is likely to impair competition. Ford's position is rooted in its previously mentioned misinterpretation of the aim of Section 7 as the simple preservation of the number of consumer alternatives, which defendant

---

the beginning of 1960 explained the matter this way:

"Reliable surveys continually indicate that only a small percentage of car owners specify a brand when ordering a change in spark plugs. This fact establishes the [franchise] dealer and the service station operator as the actual consumer of spark plugs.

"However, to sell these outlets, it is essential to convince dealers and owner-operators that the public will accept the brand spark plugs once installed. Accomplishing this requires considerable and effective advertising for public review as well as the merchandising of these advertisements to the trade level."

55. Actually, ELTRA's share of 1964 production was 1.6%. The difference between this figure and that in the text

is attributable to 2.2 million plugs manufactured under the "Autolite" brand for Ford pursuant to an agreement whereby the defendant was purchasing a minimal amount from ELTRA to assist it in opening the Decatur plant.

56. ELTRA already has on its payroll several skilled ceramics engineers, probably the most important factor in a successful insulator operation. There is no question about the company's ability to finance the necessary machinery. Actually, ELTRA purchased a surplus ceramics factory shortly after the acquisition in suit but later decided that it could be put to more profitable use at one of the firm's affiliated plants in Venezuela. Furthermore, it presently maintains a functioning insulator facility of modest size at Sarnia, Ontario.

acknowledges as it must under United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), includes would-be as well as existing industry entrants. If this were the solitary objective of the statute, a quick roll call would dispel the possibility of a violation. No firm has exited since 1960 in reaction to the asset transfer and none appears about to; and, whereas in that year Electric Autolite was a producer and Ford an inchoate fabricator, now ELTRA and Ford are both viable plug makers. Indeed, an extension of this reasoning permits defendant to go further and put forth the assertion that the market is better structured today because two *de facto* competitors should wield more beneficial force than one extant and the other contingent. This analysis may be persuasive in some settings but the spark-plug arena is not one of them.

Defendant concedes that its posture as a potential entrant decreed the six-cent price to itself. Had this been the only result of Ford's latent capacity to manufacture, there would be little sense in pursuing the matter. Obviously, this below-cost scheme heightened the barriers to admission and of late has been a principal factor limiting first-class industry membership to three. However, pre-1961 Ford also had a pervasive impact on the aftermarket. While the record does not state in so many words that defendant affected the conduct of Electric Autolite and General Motors, it certainly moderated all of Champion's replacement-sales policies directly and, given the oligopolistic structure in which Champion was the keystone, must have touched those of the others derivatively. Compare FTC v. Procter & Gamble Co., supra, 386 U.S. at 598–599, 87 S.Ct. 1224 (concurring opinion). The higher the general service-plug price level, the more attractive the enterprise would have looked to defendant. Of course, its enthusiasm was dampened by the break it received on its factory needs by staying out, but Champion certainly was not so naive as to believe that Ford could be dissuaded in this manner under all circumstances. Thus, it behooved Champion to use discretion in retail-oriented activities. Autolite and General Motors would doubtless have followed in stride lest the lure of reducing repair bills with Champion elements should cause the prevalent authenticity fixation to succumb to a universal recognition of a fact already comprehended by some mechanics who regularly interchanged brands where they did not have on hand the original-equipment type for a particular car: that top-calibre plugs for Chrysler and General Motors vehicles were available under the "Champion" name.

Happily, there is more than logic and theory to bolster these conclusions. Franchisees often found it cheaper and equally convenient to get wholesale spark plugs from Ford rather than from independent middlemen. Consequently, defendant placed large orders with Champion for replacements, accounting in 1960 for 13.2% of all of Champion's non-original-equipment sales. Needless to say, Ford possessed bargaining leverage; indeed, one of its witnesses volunteered that manipulating the charge for service elements was among "a lot of things" Champion could have done if Ford got too excited about integrating. Defendant's potential plainly had a bearing on what it paid. Furthermore, Champion's entire aftermarket felt Ford's presence because, by Federal Trade Commission mandate, the replacement price offered to defendant and to independent warehousers must be the same. *Champion Spark Plug Co.*, supra.

■ Defendant refers to the role of an automobile builder-standby plug fabricator as "meaningless" because, were it to enter, a former assembly-line supplier would be left without a foundation for the aftermarket. The fates of Champion and Autolite, had Ford expanded through its own resources exclusively, are explored below. For the moment it is sufficient to observe that the greater the dependence of survival upon original-equipment identification, the more grave the elim-

ination of Ford as a potential entrant from the viewpoint of consumer protection, the ultimate object of anti-trust legislation. While Ford was able to check any avarice on the part of Champion, there is now no similar counterbalance as to Ford, which will not be disengaged regardless how extravagant its replacement price may become. If any firm could be called meaningless, it would be ELTRA. Lacking important new-car affiliation, ELTRA looks at birth like a pygmy whose growth will be stunted by deficiencies for which no amount of exertion can compensate. It could indefinitely be without this critical backing and, thus, too crippled in the aftermarket to begin to curb Ford's excesses. Nor does it have an impact upon Champion other than in the latter's relations with Chrysler, which uses an occasional hint that it might deal with ELTRA as a club for making Champion toe the mark. However, Section 7 was no more enacted to foster the welfare of an isolated customer than that of a few sellers. Cf. Brown Shoe Co. v. United States, supra; but cf. United States v. Von's Grocery Co., supra. The ideal is broad competition in all of its ramifications and, where this in the more atomistic forms seems impossible, the goal is to salvage what remains. Here prior to 1961, defendant helped mollify the evils of oligopoly. Now the safety valve that was Ford is permanently sealed. More ominously, if "MoPar" ever catches on and becomes Chrysler's sole brand, every dominant original-equipment label will be liberated from the restraint inherent in a separation between name proprietor and automobile maker-replacements distributor.[57]

The United States urges that Ford was on the very verge of entering through internal expansion and would shortly have done so if the natural trend of events had not been interrupted by the acquisition. Perhaps; but not on this record, although there are some positive signs. Because of the devotion to original-equipment brands, defendant was perfectly situated to expect success over a period of time. Moreover, a preliminary study in 1960 forecast a long-term after-tax yield on capital of 24.3% on the basis of a 5% penetration of the independent aftermarket. This rate was well above the 15% company norm for new investments and enough to induce the Business Development Office to recommend erection of a 52-million-unit plant. That the proposal was not processed in detail by Ford's Integration Committee and was never brought to the attention of either the Executive Committee or the Board of Directors can be blamed on the availability of Fostoria. However, this is all that can conscionably be laid at the door of the acquisition, which is not, as the Government would have it, virtually uncontestable evidence that Ford otherwise would have gone forward on its own.[58] Instead of posing as a handy answer to all questions about the unknown, the transaction, coming when it did, places a more onerous burden upon plaintiff. The Development Office formulated no policies and in this case mentioned none decreed by higher authority. It did the initial spadework preparatory to a possible extensive in-

57. The record shows that certainly Chrysler and American Motors, and apparently most heavy internal-combustion-engine builders with franchise dealers at the retail level, wholesale replacement spark plugs through them.

58. Ford's own testimony shows plainly that the Integration Committee withheld formal action upon the Development Office report pending further study of the possibility of annexing Electric Autolite in whole or in part. There is no clear indication whether but for the eventual acquisition the proposal would have gone higher up through the chain of command— Operating Policy Committee, Administrative Committee, Executive Committee, Board of Directors—but, apparently, a project was scrapped by the Integration Committee itself only in unusual circumstances. While not every integration plan went as far as the Board of Directors before implementation, no final affirmative decision ever rested with the Integration Committee.

vestigation. Since one was never carried out, the Court has little information about how well in Management's opinion a plug project, which, with the six-cent price and dozens of other parts it could integrate, defendant had no compelling reason to undertake, squared with ordinary corporate guidelines for new ventures and even less about the guidelines themselves. Plaintiff must demonstrate at least that a grass-roots plan had a *prima facie* chance of approval in light of both Ford's financial conventions and organizational ambitions. Once these appear, their relative importance, and, if need be, the degree of their flexibility, together with special incentives and market outlook can be used to weigh the probability of entry.

A plug factory would have fit neatly into defendant's designs for augmented component manufacture and distribution, and would have been worthwhile over the long haul. On the other hand, nothing has been said about start-up costs, although the inference is that they would have been heavy because of the lengthy experimentation necessary to arrive at satisfactorily engineered plugs.[59] In addition, industry stocking habits and the six-cent price pointed toward an extraordinary delay before the contemplated facilities would pay off. The unanimous consensus of experienced witnesses was that a minimum of five to eight years would elapse from the point Ford started using the new elements in its cars until enough Ford-plug-equipped automobiles would be on the road to create a real retailer interest in the product. Practically no machine requires a plug change during the initial 18 months of its life, and most do not much before their third anniversaries. Several model years' outputs would have to approach this milestone before their proportion of the whole vehicle population would prompt outlets to inventory the new brand. Only then would a mechanic pick this label for General Motors and Chrysler applications. Meanwhile, of course, defendant would be missing many sales for Ford machines. Few neophytes can expect an onrush of instant acceptance. All must prepare for a few lean seasons at the outset. What complicated the problem at Ford was the unusual arrangement with Champion. In 1960, defendant needed about 16 million assembly plugs; each would have been some 14 cents more expensive if sourced inside rather than to Champion. The aggregate differential, 2.2 million dollars, would have accumulated annually to form a worrisome deficit in itself—let alone when combined with unrecovered start-up outlays—by the time Ford scratched the surface in the aftermarket, and, because the loss would have recurred perpetually, may not have been erased for a number of years thereafter. The Development Office report did not touch upon these drawbacks. However, besides altering the framework within which the estimated rate of return must be viewed, they call for an understanding of the company's pay-out schedule. Yet, plaintiff has not probed for an indication of the postponement defendant would have been willing to accommodate in the realization of an actual gain on its capital.[60]

59. More than one year elapsed following the acquisition in suit before "Autolite" and "Champion" spark plugs were approved for all Ford and Chrysler motors, respectively. When it commenced spark-plug production in 1936, it took Electric Autolite almost five years to become qualified on all Chrysler engine models. The parties have stipulated that development of correct spark plugs for factory installation requires "hundreds of thousands of miles of road-testing." The Development Office predicted start-up costs at $2–4 million. However, this estimate is highly suspect. First, it is about the same as the Office's computation of start-up costs for a battery operation which would have presented considerably less engineering difficulty. Second, testimony indicates that none of the engineering departments had much of a hand in preparing the Development Office report.

60. The Government's deficiency on this score is particularly hard to understand in light of one of its positions discussed in Part II, the implication of which is

Since this wait would have been of concern to Ford, the Court cannot pretend that it did not exist. Although he was far from comprehensive in his reasons, Irving Duffy, a recently retired member of both the Integration and Executive Committees as well as of the Board of Directors, stated unequivocally that the six-cent price and the lapse between the beginning of mass production and lucrative volume would have prohibited entry around 1960 other than in a manner in which the interval could have been sharply reduced, i. e., by the take-over of an established trade name. Because Mr. Duffy was so conclusory, he must be deemed to have been expressing his personal convictions. However, because plaintiff did not cross-examine this testimony, it was probably bedded on solid ground.

The United States maintains that Mr. Duffy's skepticism should be disregarded as devoid of "probative value" and that what Management would have voted to do absent the acquisition is "pure conjecture." The Government is the prosecutor in this litigation. It had not only the floor to refute what it thought false, but also the obligation to remove the question from the realm of speculation through evidence compatible with a rational decision on the likely tact of the particular firm under scrutiny with individual aims, insights and *modus operandi*. Plaintiff concentrates upon the first two of these factors, summarized in Ford's undeniable wish to improve service-parts income and in the belief that a spark-plug endeavor would eventually prove complementary. Thus, the Government emphasizes desire to the almost total neglect of practicality.[61] Yet the distance between them can be vast. Here, as in most cases, many appealing investments presented themselves.[62] Ford must rely upon criteria which experience has taught it are likely to lead to a judgment on the alternatives, palatable to its stockholders. So, too, must the Government.

Although the Court holds that Ford cannot be said to have been on the brink of integrating without Electric Autolite's contribution, it should examine the claim that the market would be constituted just as it is now if defendant had come in alone. This alleged equivalency of effect presupposes that had Ford struck out by itself, displaced Champion would have nudged Autolite from its niche at Chrysler, and, with no major original-equipment connection, Autolite's sales would have declined to a plateau approximating that on which ELTRA sits today. Whether the drop would have been this severe is debatable; but at least Autolite would have been headed for obscurity with no more expectation of revival than ELTRA actually has. On the other hand, if Champion would have wound up the odd-man-out in the wake of Ford's development, the story would have been different; for, while its performance would have suffered painfully, Champion probably would have retained enough strength to escape extinction by a comfortable margin.

A witness from Chrysler did state that since "Champion" would not be linked to Ford in the public mind, it was better for Chrysler's franchisee trade to employ this label with greater aftermarket promotion and selling assistance than Autolite provided. However, the truth of the matter is that under the conditions at the time, the Spring of 1961, "Champion" was the only brand not belonging to a Chrysler competitor backed by a guaranteed supply.[63] Electric Autolite's Ala-

that, in plaintiff's view, the Motorcraft ignition-parts program may shortly have been disbanded had not the "Autolite" trade name been available, because the project had sustained a deficit in the early months of its existence.

61. The Government's only concession to practicality is to note that its evidence

does show that Ford had sufficient funds to commence spark-plug manufacture and could have obtained the necessary technicians and expertise.

62. See text preceding note 35 supra.

63. Apparently, neither General Battery and Ceramic nor any of the smaller producers mentioned in note 51 supra bid for

bama plug facility was not yet operational. Although Ford was committed to sell Autolite plugs to allow it to meet unexpired contracts and compulsory renewals, they would not have had to be delivered under any name but "Autolite." Autolite's then-President recalls being told that while Chrysler would be glad to think about "Prestolite" later, the immediate object was, in his words, to move "as fast as possible to another brand that [was not] a competitor's brand." If Chrysler had been anxious for "Champion" for more than the choice it offered to dealing under an enemy ensign, this fact was a carefully guarded secret. Champion's Sales Manager, asked if he had any assurance of success before he solicited Chrysler, replied, "Not the slightest." What Chrysler would have done, if anything, in the event Ford had pushed Champion out other than in the method in which it did has not been proven. It may have preferred "Champion" but would not have been under the pressure of 1961 to abandon "Autolite." In a tranquil milieu, a change may not have seemed worth the aggravations in qualifying another manufacturer to its standards, especially when, as its Purchasing Vice President revealed, it already intended to inaugurate some type of "MoPar" plug program.

The second inaccuracy in defendant's argument is the implicit notion that the potential-entrant doctrine is without relevance unless a *de novo* entry would better redistribute the market among more contenders than would a partial acquisition. An interested firm on the outside has a twofold significance. It may someday go in and set the stage for noticeable deconcentration. While it merely stays near the edge, it is a deterrent to current competitors. United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). This was

Ford uniquely, as both a prime candidate to manufacture and the major customer of the dominant member of the oligopoly. Given the chance that Autolite would have been doomed to oblivion by defendant's grass-roots entry, which also would have destroyed Ford's soothing influence over replacement prices, Ford may well have been more useful as a potential than it would have been as a real producer, regardless how it began fabrication. Had Ford taken the internal-expansion route, there would have been no illegality; not, however, because the result necessarily would have been commendable, but simply because that course has not been proscribed.

The last phase of the discussion involves the foreclosure of Ford as a 1960 purchaser for all purposes of almost forty million units, or 9.6% of total industry output. Unlike Owosso, Fostoria can fill defendant's entire demand for its traditional assembly and franchisee uses as well as for Electric Autolite's old independent distribution channels. In spite of what seems to be a blatant Clayton Act violation according to the teaching of Brown Shoe Co. v. United States, supra, in particular when seen against the background of the exclusion at General Motors, Ford maintains that, practically speaking, the acquisition did not bring about any denial of access to any supplier but Champion—and the Government apparently finds no cause for alarm in Champion's misfortunes—because for decades no firm besides Champion had much hope for any of defendant's business. Ford points to the six-cent concession along with Champion's virtually limitless ability to lower it, which supposedly adds up to barely a possibility that Ford would ever be justified in sacrificing half a century of engineering rapport and Champion's aftermarket support by buying elsewhere. The argument flounders in the stagna-

---

the Chrysler business. Thus, its options were Ford, General Motors, the denuded Autolite and Champion.

There is no reason to believe that Electric Autolite would not have been willing

to make the "MoPar" brand concession which Champion gave to Chrysler nor evidence to suggest that it could not have afforded to.

tion required to keep it afloat. At best, it proves that Ford would not have deviated from its past sourcing in the foreseeable future. However, the horizon in that direction is very close and opaque to new circumstances just beyond.

The record shows that Ford had hinted as far away as Germany that it would turn a receptive ear toward proposals for plugs under its own name. Whether a firm like General Battery and Ceramic would ever come up with an arrangement to absorb enough of the temporary financial loss which would accompany purely internal growth to make a private-label venture attractive where integration would be precluded is not the issue, nor is there any evidence regarding even the present feasibility of such an alternative to in-house construction. What hurts is that the opportunity to try has been taken away.[64]

 While the legality *vel non* of a corporate combination cannot turn on the assumption that something might happen sometime which would cast it in a different light, a court cannot shut its eyes to contemporary or predictable factors conducive to change in the competitive structure. The acquisition of an aggressive contender can be seriously damaging even though it currently has an infinitesimal market share and a dozen more firms of similar penetration are left behind. United States v. Aluminum Co. of America, supra. Concern has been expressed in some cases that a particular merger has significantly raised the barriers to entry, apparently even without a showing that any company was knocking on the door at the moment. E. g., General Foods Corp. v. FTC, 386 F.2d 936 (3d Cir. 1967). The effect in *Alcoa* was the removal of a competitor, a recognized in-

strument for changing beneficially the degree of concentration which was then manifest. The result here is the destruction of the motivation which Ford, even though long a Champion customer, gave other plug makers to work a change which could lead to deconcentration. Indeed, it is much more: the elimination of one of the very few discernible ways in which such a change could be brought about. A small plug fabricator, dissatisfied with its lowly rank, had extremely limited options. Apart from building automobiles or convincing several million more people to buy American Motors cars, it either had to persuade innumerable retailers to break with their quite rational stocking practices or sell to Ford or Chrysler.[65] While gaining acceptance at Ford would not have been easy, it was doubtless a less difficult path than most of the others. Obviously, a chance to take whatever steps were necessary to secure the Ford account meant more in terms of reducing the influence of the oligopolistic forces in the spark-plug industry than did one small company in the *Alcoa* aluminum-conductor fields.

## V

### AUTOMOBILES

The vehicles comprising the automobile line of commerce are four-wheeled passenger cars, of which there are, for all practical purposes, four United States manufacturers: American Motors, Chrysler, Ford and General Motors. In 1964, their respective shares of domestic production, for sale at home and abroad, were 5.1%, 16%, 27.7% and 51.1%. The Government contends that the acquisition deprived the two smallest firms "of access to a substantial independent [i. e., not a part of Ford or GM] sup-

---

64. The mention of General Battery and Ceramic only is not meant to be exhaustive of the possibilities, but simply to recognize the fact that as late as three weeks before the acquisition in suit this firm was in touch with Ford on a private-brand plug proposal. In addition, one cannot overlook GB&C's recently heightened interest in selling more batteries,

another product of which Ford was a major buyer. See text accompanying note 44 supra.

65. Even the truck market offered little independent opportunity, for Chrysler, Ford and General Motors accounted for 75% of production, totaling 1.2 million units, including jeep-type vehicles, in 1960.

plier of spark plugs [and to] a significant independent brand name for batteries, spark plugs and ignition parts."

One cannot quarrel with the validity of this statement, at least if "substantial" is taken to refer to present output and "significant" to mean "familiar." However, even with all the adjectives, there is not a shred of evidence that it has any bearing upon the competitive position of either American or Chrysler.

Noting the purchase by both companies of "Autolite" plugs and batteries for factory installation for some time before April 1961, the Government says:

> "It is clear that [the two firms] had built up a long-standing, important association between their brand of automobiles and Autolite-branded items with resultant consumer goodwill."

Maybe plaintiff believes that it was the fear of someday being accused of monopolizing the industry on the strength of the goodwill created by "Autolite" which persuaded American Motors to use twice as many "Champion" as "Autolite" plugs on its assembly lines in 1959 and 1960 and to seek bids for a private-label "Rambler" battery as early as the Fall of 1960. Chrysler introduced its own name, "MoPar," on batteries around 1956, and, according to its Purchasing Vice President, would have moved toward a corporate identity symbol for

plugs, as it has to some degree, regardless of the "Autolite" transfer.[66] Not surprisingly, the United States found no witness nor even any Management opinions tucked away in defendant's files to suggest an instance in which an automobile had been sold, wholly or partially, because of the brand on its spark plugs or battery, let alone on articles buried deeper inside the motor. It is doubtful that any court has been asked to make a smaller tail wag a larger dog than was this one when it was requested to hold, in effect, that persons, either generally or in numbers large enough to meet the substantiality test of Section 7, rest their decisions on two thousand dollar-and-up cars upon the *trademark* on a few components.

The record contains the views of many persons regarding the attitudes of the several automobile builders about dealing in parts with one another. In summary, they prefer not to, but have little hesitation when one of their rivals offers the best price and/or the highest quality. However, neither American nor Chrysler is under any more compulsion now than it ever was to procure spark plugs from Ford or General Motors. While ELTRA is not a major fabricator in the quantitative sense, it is unquestionably an experienced and respected plug manufacturer capable of meeting the needs of any internal-combustion-engine producer. In

---

**66.** American Motors discontinued all spark-plug and battery sourcing to Electric Autolite in June 1961. According to its then-Executive Vice President, the battery decision turned upon the fact that Autolite would not furnish under a private label a battery of the special design (with 24,000-mile warranty) that American wanted. This episode fairly summarizes the whole component-branding situation from the vehicle builder's standpoint. It would generally take parts with its own name—to give the appearance of integration and to allow it to capitalize on the demand for original-equipment-type replacements—if it could get them and still be assured of proper quality. The exception to the norm would be items like spark plugs, which are heavily advertised in the aftermarket by the brand proprietor. Here, the publicity can do some good in advancing replacement sales through franchise dealers, and the vehicle builder may prefer to "ride with" the supplier's campaign. The Government has not suggested a formula for translating into substantial competitive disadvantage in the automobile field the possible loss to Chrysler and American from reduced aftermarket plug sales if either is forced to stop buying "Champion" elements and, not wishing to turn to Ford or General Motors, must settle for a brand less strongly promoted than "Autolite" was.

fact, representatives from both American Motors and Chrysler classified ELTRA as an acceptable supplier, although the issue is quite hypothetical; for, as Part IV suggests, where the next spark plug is coming from has traditionally been among the less weighty matters on the minds of Detroit executives. It is immaterial that ELTRA to date has been more ready to sell than any big customer has been willing to buy, with the result that the company thus far has felt it uneconomical to mold ceramic insulators itself. ELTRA can, and should be able to continue to, deliver satisfactory goods on schedule and at a tolerable cost.[67] This is all that must be found to conclude that there is not a tenable probability that since today's ELTRA has been substituted for the Electric Autolite of 1960, American Motors or Chrysler will be left with Champion as the only alternative to relying upon their own competitors for spark plugs.

The most plausible argument, which, incidentally, the Government has not expressly presented, is that the acquisition has increased the chance that American Motors may at some point in the future be denied the six-cent price for spark plugs. Its low volume does not now justify any plug maker in providing this accommodation to it alone.[68] The inference is that American has been receiving the benefit because it has always bought from a supplier to another automobile firm with an output large enough to warrant the minimal charge. In 1961, the number of such customers was reduced to Chrysler, which may eventually use only "MoPar"-branded elements and, thus, forego the six-cent arrangement premised on the understanding that the car manufacturer will give exposure to the plug company's proprietary label. Even if, in this event, American also has no one agreeable to granting it the special discount, the effect upon its competitive ability would be insignificant and very likely totally undetectable, given the relative worth of half-a-dozen spark plugs next to the hundreds of other parts which must be brought together to turn out a vehicle.

American Motors is the least integrated of the four car companies under discussion. What this means in specific comparative terms is not shown, nor is the extent of the market advantage of the other three over American, if any, attributable to their greater internal construction. Arguably, were the disparity great, they could stand noticeably stronger because of it. Nevertheless, the instant acquisition is itself minor in scope, covering only two articles. Both of them are cheap to purchase, with or without the six-cent consideration, and one, the battery, is quite easy and inexpensive to manufacture. Therefore, were Ford someday to become completely integrated, the items it added in 1961 would account for a tiny proportion of whatever superiority it could ultimately attain. The combination in issue logically leads to no others, nor will it have a causal connection with further grass-roots expansion except in the battery area. Thus, while it is unknown whether defendant will ever achieve an edge over American Motors (or Chrysler) because of more encompassing inside production, or will pursue a path of growth which will elevate the barriers to entry into the auto-

---

67. See notes 55 and 56 supra and accompanying text. The fact that ELTRA has no ceramic capacity at its Alabama plug plant seems particularly unimportant in determining its status as a supplier to an automobile builder because of the long time required to engineer plugs to assembly-line specifications (see note 59 supra). During this interval, ELTRA could doubtless complete an insulator facility, plans for which, incidentally, have been prepared for several years. In any event, nothing justifies a finding that the competitive position of American Motors or Chrysler would be impaired by their purchasing ELTRA plugs containing insulators gotten from another producer, including Ford. Indeed, no evidence suggests competitive injury if they obtained the whole plug from Ford.

68. See text following note 50 supra.

**445**

mobile field noticeably higher than they are now, this much is certain: the Ford-Autolite compact will not have been responsible for the outcome.

To condemn the acquisition on the ground that the probable result will be a substantial lessening of competition in the automobile line of commerce through the weakening of either American Motors or Chrysler requires, on the evidence submitted, an "almost unlimited extrapolation in the name of incipiency." Bork and Bowman, The Crisis in Anti-Trust, 65 Colum.L.R. 363 (1965). To premise illegality upon the notion that admission for newcomers has been made more difficult calls for approaching the question with a vengeance over what transpired in the industry decades ago.

## VI

### CONCLUSION

■■■■ On the basis of the foregoing facts and discussion of the applicable principles of law, the Court holds that the effect of the acquisition of the previously described assets of The Electric Autolite Company by Ford Motor Company may be substantially to lessen competition in automotive batteries and spark plugs throughout the United States, but that the acquisition probably will have neither this result nor a tendency to create a monopoly in automobiles or ignition parts in any section of the country.

"The phrase ['in any line of commerce'] is comprehensive and means that if the forbidden effect or tendency is produced in *one* out of *all* the various lines of commerce, the words 'in *any* line of commerce' literally are satisfied." Van Camp & Sons Co. v. American Can Co., 278 U.S. 245 at 253, 49 S.Ct. 112 at 113, 73 L.Ed. 311. See also United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057.

For these reasons, the acquisition constitutes a violation of Section 7 of the Clayton Act.