**UNITED STATES of America,**
**Plaintiff,**

v.

**FORD MOTOR COMPANY and The Electric Autolite Company, Defendants.**

**Civ. A. No. 21911.**

United States District Court,
E. D. Michigan, S. D.

July 7, 1970.

William H. McManus, Alan R. Malasky, Attys., Dept. of Justice, Washington, D. C., for the United States.

Wright Tisdale, Richard B. Darragh, Dearborn, Mich., Jerome G. Shapiro, L. Homer Surbeck, Hughes, Hubbard, Blair & Reed, New York City, George E. Brand, Jr., Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., for Ford Motor Co.

A. Stewart Kerr, Sweeny, Dodd, Kerr, Wattles & Russell, Detroit, Mich., for the Electric Autolite Co. (Eltra Corp.)

Paul E. Gillmor, Tiffin, Ohio, amicus curiae, for Fostoria Community Industrial Association and UAW Local 533.

Fred R. Echelbarger, City Solicitor, amicus curiae, for City of Fostoria.

George A. Cooney, Jr., Detroit, Mich., amicus curiae, for City of Fostoria, Fostoria Community Industrial Association and UAW Local 533.

## OPINION

FREEMAN, Chief Judge.

This is a proceeding to determine what relief should be entered in this antitrust case. In April 1961 Ford acquired, by purchase, certain assets of

the Electric Autolite Company:[1] 1) a spark plug factory in Fostoria, Ohio; 2) a battery factory in Owosso, Michigan; and 3) the trade name "Autolite." Within in a few days after the contract of purchase was executed, the Government requested information from Ford concerning the acquisition and in November 1961 this suit was filed. On June 10, 1968, this court held that the acquisition violated Section 7 of the Clayton Act in the spark plug and battery lines of commerce. 286 F.Supp. 407. During the next year the parties negotiated with each other in an unsuccessful attempt to agree on appropriate relief. Proposed orders of relief were then filed with the court, along with briefs. Beginning January 12, 1970, testimony was taken for nine days concerning the relief issue. Further briefs were submitted following the hearing and oral argument was heard on April 2, 1970.

I

*The Proposals*

Basically, the Government requests complete divestiture of the assets acquired by Ford as well as a subsequently constructed battery plant in Shreveport, Louisiana. It is also proposed that Ford be prohibited from manufacturing spark plugs for ten years and that it be required to purchase a declining percentage of its spark plug needs from the operator of the divested spark plug factory (hereinafter referred to as "New Fostoria"), which spark plugs are to be labeled "Autolite."

On the other hand, Ford proposes that it be permitted to retain the facilities acquired from the Electric Autolite Company, together with the trade name "Autolite"; that Ford provide Eltra Corporation with certain machinery to increase its production capacity; and that Ford purchase 30,000,000 spark plugs per year from Eltra for ten years. In this way Ford proposes to raise Eltra's spark-plug-making capacity to about 56,000,000 plugs per year from the present production of 17,000,000 and at the same time provide Eltra with an outlet for the sale of these additional spark plugs. Finally, Ford would be enjoined from acquiring any other spark plug or battery plant for ten years and from construction in the United States of additional facilities for the manufacture of automotive batteries other than where its existing battery factories are located for five years.

It is difficult to conceive of proposals for relief that are farther apart and that share less common ground. It is in just this kind of situation where someone is most likely to be seriously injured. For this reason and because of the possibly very serious adverse consequences to the Fostoria community, which have been brought to the court's attention by counsel for Fostoria, appearing as *amicus curiae*, the court has proceeded most carefully and deliberately in determining what relief it will decree.

"Judges in prescribing remedies have known their own limitations. They do not *ex officio* have economic or political training. Their prophecies as to the economic future are not guided by unusually subtle judgment. They are not so representative as other branches of the government. The recommendations they receive from government prosecutors do not always reflect the over-all approach of even the executive branch of the government, sometimes not indeed the seasoned and fairly informed judgment of the head of the Department of Justice. Hearings in court do not usually give the remote judge as sound a feeling for the realities of a situation as other procedures do. Judicial decrees must be fitted into the framework of what a busy, and none too expert, court can supervise. Above all, no matter with what authority he is invested, with what facts and opinion he is supplied, a trial judge is only one man, and should move with caution and humility." United States v. United Shoe

1. Now known as Eltra Corporation.

Machinery Corp., 110 F.Supp. 295, 347–348 (D.Mass.1953).

## II

### Spark Plugs

While familiarity with the court's opinion on merits is assumed, it is appropriate to restate the two reasons why the acquisition was found to substantially lessen competition in the spark plug line of commerce. First, the court held that prior to entry into the spark plug market in 1961, Ford had a pervasive impact on the aftermarket in that it "moderated all of Champion's replacement-sales policies directly and, given the oligopolistic structure in which Champion was the keystone, must have touched those of the others derivatively." 286 F.Supp. at 437.

> "An interested firm on the outside has a twofold significance. It may someday go in and set the stage for noticeable deconcentration. While it merely stays near the edge, it is a deterrent to current competitors. United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 * * * (1964). This was Ford uniquely, as both a prime candidate to manufacture and the major customer of the dominant member of the oligopoly. Given the chance that Autolite would have been doomed to oblivion by defendant's grass-roots entry, which also would have destroyed Ford's soothing influence over replacement prices, Ford may well have been more useful as a potential than it would have been as a real producer, regardless how it began fabrication." *Id.*, at 441.

See FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303, (1967), and United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).

The second ground for finding a violation of Section 7 was the foreclosure of Ford as a purchaser of about ten per cent of total industry output. 286 F.Supp. at 441. Thus, companies presently making spark plugs and those who might desire to enter in the future are hurt by this reduction in their possible sales.

In short, Ford's entry into the spark plug market by means of the acquisition of the factory in Fostoria and the trade name "Autolite" had the effect of raising the barriers to entry into that market as well as removing one of the existing restraints upon the actions of those in the business of manufacturing spark plugs.

It will also be noted that the number of competitors in the spark plug manufacturing industry closely parallels the number of competitors in the automobile manufacturing industry and the barriers to entry into the auto industry are virtually insurmountable at present and will remain so for the foreseeable future. Ford's acquisition of the Autolite assets, particularly when viewed in the context of the original equipment (OE) tie and of GM's ownership of AC, has the result of transmitting the rigidity of the oligopolistic structure of the automobile industry to the spark plug industry, thus reducing the chances of future deconcentration of the spark plug market by forces at work within that market.

The relief granted must be designed to eradicate the tendencies of the acquisition to substantially lessen competition in the context of the present market and economic conditions. United States v. Continental Can Co., 378 U.S. 441, 461, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. E. I. DuPont De Nemours & Co., 366 U.S. 316, 325–326, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961); and United States v. Crescent Amusement Co., 323 U.S. 173, 188, 65 S.Ct. 254, 89 L.Ed. 160 (1944).

> "The protection of the public interest is the purpose of the statute and it is served when a violation of the statute has been found and the relief effectively pries open to competition a market that has been closed by defendant's illegal restraints." United States v. Aluminum Company of America, N.D.N.Y., April 27, 1966,

CCH Trade Cases 1967, ¶ 71, 980.

To this end divestiture has been described as "the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found." United States v. E. I. DuPont De Nemours & Company, *supra,* 366 U. S. at pp. 330–331, 81 S.Ct. at pp. 1252–1253.

In its discussion of general considerations concerning "that most drastic, but most effective, of antitrust remedies" the Supreme Court, in DuPont, reiterated the criteria to be applied in determining the relief to be granted in an antitrust case:

> "In United States v. American Tobacco Co., 221 U.S. 106, 185, 31 S.Ct. 632, 55 L.Ed. 663 (1911), we said:
>
> > 'In considering the subject * * * three dominant influences must guide our action: 1. The duty of giving complete and efficacious effect to the prohibitions of the statute; 2, the accomplishing of this result with as little injury as possible to the interest of the general public; and, 3, a proper regard for the vast interests of private property which may have become vested in many persons as a result of the acquisition. * * *'" *Id.,* at 327–328, 81 S.Ct., at 1251.

The Court also stated:

> "If the Court concludes that other measures will not be effective to redress a violation, and that complete divestiture is a necessary element of effective relief, the Government cannot be denied the latter remedy because economic hardship, however severe, may result. *Economic hardship can influence choice only as among two or more effective remedies.*" *Ibid.,* p. 327, 81 S.Ct., p. 1250. [Emphasis added.]

Finally, the Court also made the following observation:

> "The burden is not on the Government to show de novo that a 'pass through' of the General Motors vote, like du Pont's ownership of General Motors stock, would violate § 7. United States v. Aluminum Co. of America, 91 F.Supp. 333, 346 (D.C.S.D.N.Y. 1950). It need only appear that the decree entered leaves a substantial likelihood that the tendency towards monopoly of the acquisition condemned by § 7 has not been satisfactorily eliminated." *Id.,* pp. 331–332, 81 S.Ct. p. 1253.

Ford argues that divestiture is unnecessary, and therefore punitive, because under its proposal there will be four major spark plug manufacturers rather than the three that will result, if divestiture is ordered. Ford assumes that Eltra will be forced out of the spark plug business in the event of divestiture. It asserts that its proposal leads to a more competitive spark plug manufacturing industry than existed either before the acquisition or will exist after divestiture. This position was dealt with in the court's Opinion on merits.

> "* * * Unable to traverse several of the pivotal factual premises underlying plaintiff's contentions and hesitant about the validity of others, much of the defense speaks in the tenor of a demurrer. For instance, Ford admits it was a potential *de novo* spark-plug producer in the late 1950's, but denies that the assumption of Fostoria and 'Autolite' is likely to impair competition. Ford's position is rooted in its previously mentioned misinterpretation of the aim of Section 7 as the simple preservation of the number of consumer alternatives, which defendant acknowledges as it must under United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 * * * (1964), includes would-be as well as existing industry entrants. If this were the solitary objective of the statute, a quick roll call would dispel the possibility of a violation. No firm has exited since 1960 in reaction to the asset transfer and none appears about to; and,

whereas in that year Electric Autolite was a producer and Ford an inchoate fabricator, now ELTRA and Ford are both viable plug makers. Indeed, an extension of this reasoning permits defendant to go further and put forth the assertion that the market is better structured today because two *de facto* competitors should wield more beneficial force than one extant and the other contingent. This analysis may be persuasive in some settings but the spark-plug arena is not one of them." At pp. 436–437.

Moreover, Ford assumes that the court should look to the level of the ultimate consumer in fashioning its relief. It then points out that spark plugs of all major brands are available at prices well below the suggested retail price of $1.20 to $1.25. This is true, but such availability is in no way the result of manufacturers' efforts. The anticompetitive effects flowing from the acquisition are at the manufacturing level and at that level the lowest acquisition cost of AC, Champion and Autolite spark plugs to warehouse distributors varies by less than one cent.[2] This consistency in price has prevailed since 1963.

■ It appears to the court that, in view of the structural effects of this acquisition which have been found to be likely to substantially lessen competition in the spark plug industry, the only remedy that will effectively correct the situation is that of divestiture. In no other way can the foreclosure of Ford be overcome. The same is true of Ford's pre-1961 impact on the actions of Champion and the other major manufacturers of spark plugs.

"The case falls squarely within the principle that where there has been a 'history of tendency toward concentration in the industry' tendencies toward further concentration 'are to be curbed in their incipiency.' Brown Shoe Company v. United States, 370 U.S. 294, at 345, 346, 82 S.Ct. 1502, 8

L.Ed.2d 510." United States v. Continental Can Company, 378 U.S. 441, 461, 84 S.Ct. 1738, 1749, 12 L.Ed.2d 953.

The effects of the acquisition are particularly apparent today. For the first time in many years there is a rising wind of new forces in the spark plug market which may profoundly change it. It is true that these forces are not all tending in the same direction. But it is the purpose of the antitrust laws and the duty of this court to free these forces from the unlawful restraint imposed upon them so that they may run their natural course.

Historically, the overwhelming majority of replacement spark plugs have been dispensed by a mechanic in a service station or independent garage. Being relatively unsophisticated in the fine points of spark plug technology and being fearful of serious damage to the motor resulting from an improper choice of plug, he has a propensity to select the brand sanctioned by the builder of the motor that he is working on. For this reason it has been absolutely necessary for the would-be spark plug maker to have his product installed in cars as original equipment if he is to have any chance of selling in the after-market. Indeed, this is the reason that plugs are sold to the manufacturers for OE installation at six cents each—one-third the cost of making a plug. 286 F.Supp. at 433–436.

It appears from the testimony of Mr. Fiene, Vice President for Marketing of the Prestolite Division of Eltra Corporation, and Exhibits FR–42 and 43, that the private brand sector of the plug market will grow substantially during the next ten years because of changes in marketing methods. The mass merchandizers are beginning to enter the plug marketing field in force. They not only sell all brands of plugs over the counter, but they are building service bays. In these bays many carry only spark plugs

2. As of January 1, 1970, these prices were: Autolite: $.4234; Champion: $.4181; and AC: $.4200. See Exhibit FR–13.

under their own proprietary brand. Exhibit FRC–44. He expects that the share of the spark plug market accounted for by private brand sales of the mass merchandizers will increase from the present 4.4 per cent to 10 per cent, or 85.7 million spark plugs, by 1980. See Exhibit FR–43. He also expects oil companies, other than Standard which is now in the market, to enter the private label field by 1980 so that the total private brand portion of the plug market will then represent about 17 per cent of the total replacement spark plug market, or 145 million units. See Exhibit FR–42.

Ford necessarily accepts these figures since its entire relief proposal is premised on the assumption that they are reasonably accurate.

The importance of these figures lies in the fact that they reveal that forces are now at work within the spark plug market that may well lead to its eventual deconcentration by increasing the number of potential customers for a new entrant into the plug manufacturing business and reducing the need for original equipment identification. Yet, at present, these forces are restrained more than they would otherwise be on account of the present oligopolistic structure of the spark plug manufacturing industry. It appears that neither AC nor Autolite sell private label plugs. It is in the self-interest of the OE plug manufacturers to discourage private brand sales and to strengthen the OE tie.[3] To the extent that the spark manufacturers are not owned by the auto makers, it seems clear that they will be more favorably disposed toward private brand sales and will compete more vigorously for such sales. Also, the potential entrant continues to have the chance to sell not only the private brand customer but the auto maker as well.

■ The court wishes to note here that although it finds that divestiture is the only effective remedy, it does not agree with the Government that the remedy should be affirmatively designed to "break the OE tie." The remedy is designed to correct the violations of Section 7 found by the court. The OE tie, as such, does not violate Section 7.

It also appears to the court that certain injunctive provisions are required in order that divestiture may be made effective and to give New Fostoria an opportunity to establish its competitive position.

■ From the date of sale of the Fostoria facility, Ford will be prohibited from manufacturing spark plugs for a period of ten years; will be required to purchase one-half of its total annual requirements of spark plugs from the New Fostoria bearing the Autolite label for a period of five years and for this purpose Ford's "annual requirements" shall include those spark plugs presently made at the Fostoria plant for export accounts; and Ford shall not be permitted to use or market a private label spark plug for five years.

Also, Ford shall be prohibited from selling spark plugs to its dealers at less than the prevailing jobbers' selling price for ten years after divestiture, and to the extent that it sells Autolite plugs to its dealers, these plugs shall be packaged and numbered identically as those obtained by dealers from independent jobbers. Ironically, it was Ford that made this court so painfully aware of the difficulty a spark plug manufacturer has in persuading warehouse distributors to carry a new line of spark plugs. Indeed, the evidence establishes that Ford was unable to assemble an adequate distribution system in the aftermarket for its Autolite spark plugs over a six-year period, until it raised the price of spark plugs sold to its dealers to a level where jobbers could compete for the dealer business. Only by diverting this dealer business was it able to obtain warehouse distributors who, in turn pushed the sale

---

3. Private brand plugs are sold at 26 to 28 cents each, while OE plugs are sold at about 40 cents each.

of Autolite plugs in other channels of the replacement market.

A great part of Ford's defense to the Government's proposal centered on the contention that the New Fostoria could not survive. Part of that assertion was founded on the premise that two-thirds of the present Autolite distribution would be lost to the New Fostoria immediately upon divestiture and that the remaining one-third might well deteriorate rapidly. One of the major reasons that two-thirds of its distribution system would vanish is that Ford expects to resume selling plugs to its dealers at a much reduced price and one which jobbers could not meet. In order to give the New Fostoria time to establish itself, Ford must continue its present policy of selling spark plugs to its dealers at prices competitive with those obtainable from independent jobbers. In this way most of Autolite's present distribution can be preserved to the New Fostoria for an interim period.

The court also takes notice of the very significant place that the spark plug plant has in the economic picture in Fostoria. This factory employs about 1,540 persons, or one-third of the employment in the community. According to the testimony of Mr. Graber, Financial Secretary of the Union representing the employees at this factory, about one-half of the persons employed at the plant are over forty years of age. Also, Mr. McCambridge, Superintendent of Schools in Fostoria, and Mr. Peeler, the Mayor of Fostoria, explained how this plant and employment affect the city's finances and proposed capital improvement program.

While the court is limited in its ability to protect the employees of the Fostoria plant, it can and will order that, as a condition of sale, the purchaser of the plant must agree to carry out all wage and pension obligations of Ford as of the time of sale. Also, if Ford removes the non-plug operations[4] from the Fostoria plant to other factories

owned by it, to the extent that new jobs are thereby created at these factories, Ford must offer employment to those at the Fostoria plant displaced by the transfer. Ford shall bear the cost of relocating those who accept such offers.

In order that Ford shall have ample time to find a buyer for the Fostoria spark plug factory and the "Autolite" trade name, it shall have until December 31, 1971, to divest itself of these assets.

## III

### Batteries

In its Opinion on merits, this court found that the acquisition of the Owosso battery plant and Autolite name violated Section 7 of the Clayton Act because it was the primary vehicle by which substantial foreclosure of Ford purchases was ultimately to be achieved. The objective of foreclosure would require construction of other factories around the country. 286 F.Supp. at 429.

If the operative facts surrounding Ford's battery requirements and the number of batteries sourced internally were the same today as they were in 1964, this court might well hesitate to order divestiture of the Owosso battery plant in favor of some form of injunctive relief. However, Exhibit FR–29 clearly shows that by 1971 Ford will have foreclosed 80 per cent of its battery needs. This will have been accomplished by expansion of the Owosso facility and construction of a new factory in Louisiana. Since foreclosure has already been largely achieved, injunctive provisions prohibiting acquisition or construction of new plants and expansion of existing facilities are inadequate. Therefore, Ford will be directed to divest itself of the Owosso battery factory.

It does not follow, however, that divestiture of the Shreveport plant must also be decreed as the Government desires. Batteries cannot be shipped long distances economically. 286 F.Supp. at 423. The Shreveport plant was con-

4. These operations account for about fifty jobs.

structed by Ford but was not a fruit of the acquisition. Ford did not acquire special technical information or use of patents, nor had the Shreveport plant been previously planned by the Electric Autolite Company, thus distinguishing *United States v. Aluminum Company of America*, 247 F.Supp. 308, 315, 316 (E. D.Mo. 1965), aff'd, 382 U.S. 12, 86 S.Ct. 24, 15 L.Ed.2d 1 (1965), relied upon by the Government to support such divestiture.

Shorn of the trade name "Autolite" and the Owosso facility, Ford is hardly likely to foreclose its needs for batteries from the Shreveport factory. The Shreveport plant represents internal expansion, which is not proscribed by Section 7.

Ford will also be prohibited from acquiring or building any new battery plant or expanding the Shreveport plant for five years from divestiture of the Owosso plant.

The court retains jurisdiction of this suit to effectuate and assure compliance with the terms and provisions of the judgment to be entered.

An appropriate form of judgment shall be submitted.